02D02-2401-PL-000027
Allen Superior Court 2

Filed: 1/22/2024 2:43 PM
Clerk
Allen County, Indiana
BB

### INDIANA COMMERCIAL COURT

| | | |
|---|---|---|
| **STATE OF INDIANA** | ) | **IN THE ALLEN SUPERIOR COURT** |
| | )SS: | |
| **COUNTY OF ALLEN** | ) | **CAUSE NO.** |

OMNISOURCE, LLC,                                          )
                                                                        )
        Plaintiff,                                                  )
                                                                        )
vs.                                                                    )
                                                                        )
BURGESS GROUP CONSOLIDATED, LLC,    )
and BURGESS CORPORATION,                        )
                                                                        )
        Defendants.                                             )

### COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

OmniSource, LLC ("OmniSource"), by counsel, submits its Complaint for Damages and Declaratory Relief against Burgess Group Consolidated, LLC ("Burgess Group"), and Burgess Corporation.

#### INTRODUCTION

1.     This Complaint involves multiple contractual breaches by the Defendants related to the sale of property by OmniSource that fall into two general categories. First, OmniSource sold property to Burgess Group under contracts and a deed that required Burgess Group to take the property subject to a variety of agreements and restrictions, including a Track Use Agreement that benefited third-party Louisiana-Pacific Corporation ("Louisiana-Pacific"). Burgess Group failed to honor the Track Use Agreement, abide by other contractual requirements, and ignored its contractual indemnity obligations, all of which led to OmniSource incurring over $2.5 million in damages to Louisiana-Pacific. Second, as part of the property transaction, Burgess Group's affiliate, Burgess Corporation, took on the responsibility of removing

1

equipment from the property in a timely manner. The Defendants collectively failed to do so, leading to OmniSource incurring significant losses of time and money. The Defendants have compounded these problems by refusal to compensate OmniSource for expenses incurred because of the Defendants' failures or to release escrowed funds to OmniSource. All told, the Defendants disregarded their contractual obligations to OmniSource in multiple ways and cost OmniSource millions of dollars.

**PARTIES AND JURISDICTION**

2.    OmniSource is an Indiana limited liability company with a principal place of business in Allen County, Indiana.

3.    Burgess Group is a North Carolina limited liability company.

4.    Burgess Corporation is a North Carolina corporation.

5.    Jurisdiction exists in Indiana pursuant to a forum selection clause in the contracts that form the basis of this suit.

6.    Venue is proper in Allen County pursuant to the forum selection clause in the contracts that form the basis of this suit.

7.    This matter involves disputes between commercial entities and is appropriate for Commercial Court pursuant to Commercial Court Rule 2.

**FACTUAL BACKGROUND**

OmniSource's sale of the Property to Burgess Group

8.    On or about November 22, 2021, OmniSource and Burgess Group entered into a Real Estate Sale and Purchase Agreement (the "Purchase Agreement") related to property located in Wilmington, North Carolina (the "Property"). A true and correct copy of the Purchase Agreement is attached as "Exhibit A."

3997321 *Complaint for Damages and Declaratory Relief*

9.      OmniSource and Burgess Group subsequently entered into a First Amendment to Real Estate Sale and Purchase Agreement (the "First Amendment"), a true and correct copy of which is attached as "Exhibit B," and a Second Amendment to Real Estate Sale and Purchase Agreement (the "Second Amendment"), a true and correct copy of which is attached as "Exhibit C."

10.     The Purchase Agreement defines the Property as including the "Real Estate," which is defined in the Purchase Agreement as follows:

> (g) "Real Estate" shall mean the real property located in New Hanover County, North Carolina, commonly known as 2830 U.S. Highway 421 N, Wilmington, North Carolina, as presently identified by the description in Exhibit A attached hereto and made a part hereof. The full legal description of the Real Estate shall be confirmed and stated in the Survey (as hereinafter defined). The Real Estate includes all land, buildings, improvements, fixtures, signage, tenements, hereditaments and appurtenances belonging or in any wise appertaining to such real property, and all of Seller's right, title and interest, if any, in and to (i) any land lying in the bed of any street, road or avenue, open or proposed, in front of or adjoining such real property to the center line thereof to the extent included in the legal description of the Real Estate, but subject to public rights-of-way and easements; (ii) any strips and gores of land adjacent to, abutting or used in connection with such real property; (iii) any easements and rights, if any, inuring to the benefit of such real property or to Seller in connection therewith; (iv) any riparian rights in connection with such real property; and (v) any and all rights in and to any leases, licenses or other assets of any type or nature pertaining to the use of such real property.

11.     Prior to closing on the sale of the Property, Burgess Group was made aware of a Track Use Agreement between OmniSource and Louisiana-Pacific under which Louisiana-Pacific was permitted to use rail located on the Property in exchange for payment of certain maintenance related costs by Louisiana-Pacific.

12.     Burgess Group agreed to assume the Track Use Agreement upon the sale of the Property.

13.     On June 17, 2022, OmniSource transferred the Property to Burgess via Special Warranty Deed (the "Deed"). A true and correct copy of the Deed is attached as "Exhibit D."

14.     The Deed states that the Property is being transferred to Burgess subject to the following:

> The property hereinabove described is a portion of the same property acquired by Grantor by instrument recorded in Book 4685 at Page 192 in the Office of the Register of Deeds for New Hanover County.
>
> TO HAVE AND TO HOLD the aforesaid lot or parcel of land and all privileges and appurtenances thereto belonging to the Grantee in fee simple.
>
> TOGETHER WITH: (i) all buildings and improvements located on the aforesaid lot or parcel of land, (ii) all fixtures affixed to all such buildings and improvements, (iii) all easements, rights of way, privileges, licenses, hereditaments, appurtenances and all other rights and benefits appurtenant or in any way related to, and/or demised under any lease of or other context or agreement for the use of the aforesaid land, and (iv) all strips and gores and any land lying in the bed of a public road, highway or other access way, open or proposed adjoining the aforesaid land.

15.     Also on June 17, OmniSource emailed Louisiana-Pacific, copying Burgess Group's principal, Vince Burgess, stating that the sale had occurred and providing Vince Burgess's contact information so that the entities could arrange for payment pursuant to the terms of the Track Use Agreement.

16.     Vince Burgess did not respond to this email or raise any objection to the transfer or assumption of the Track Use Agreement.

17.     Burgess Group subsequently sold the Property to a related entity, 2830 Highway 421 Owner, LLC ("2830").

<u>Louisiana-Pacific files an arbitration demand against OmniSource based on the failures to acknowledge the Track Use Agreement by Burgess Group and/or its affiliated entities.</u>

18.     Approximately one month after OmniSource's sale of the Property to Burgess, a dispute arose in which 2830, acting in concert with Burgess Group and/or Burgess Corporation, refused to acknowledge the Track Use Agreement and stated that

they would not allow Louisiana-Pacific and/or the entity to whom Louisiana-Pacific sold its property, to use the rail on the Property.

19.    2830 ultimately obtained payment of $2.2 million from Louisiana-Pacific in exchange for the execution of an agreement similar to the Track Use Agreement that allowed the purchaser of Louisiana-Pacific's land to use rail on the Property.

20.    Louisiana-Pacific filed an arbitration demand against OmniSource seeking to recover this $2.2 million, plus related costs and expenses (the "Arbitration").

21.    OmniSource notified Burgess Group of the Arbitration and demanded that Burgess Group indemnify OmniSource for all expenses and damages related to the Arbitration pursuant to the Purchase Agreement's indemnity provision that states:

> Buyer covenants and agrees to indemnify, defend and hold harmless the Seller Affiliated Parties from any Claims, and pay any and all costs, including reasonable attorneys' fees, in connection with such Claims. Buyer shall assume any judgment or settlement arising from a Claim in its entirety and defend, indemnify, and hold harmless the Seller Affiliated Parties. This covenant and agreement of Buyer shall survive Closing.

(Purchase Agreement §9(b).)

22.    The Purchase Agreement defines "Claims" as:

> (ii) "Claims" shall mean any and all losses, damages, costs, fees, fines, penalties, liabilities, causes of or choses in action, or other claims, regardless of whether liability is predicated upon tort, contract, strict liability, warranty, any Environmental Law, or any other legal or equitable theory, relating to the physical or environmental condition of the Property, including without limitation any hazardous substances, petroleum, hazardous wastes, or other contaminants released on, at, or near the Property or at, on, in, under, entering on to or emanating from the Property. The term "Claims" shall also include claims based on a breach of or failure to perform under this Agreement.

(Purchase Agreement §9(a)(ii).)

23.    The Purchase Agreement defines "Property" as "the Real Estate and Personal Property." (Purchase Agreement §1(f).)

24.     The Purchase Agreement defines "Real Estate" as:

(g) "Real Estate" shall mean the real property located in New Hanover County, North Carolina, commonly known as 2830 U.S. Highway 421 N, Wilmington, North Carolina, as presently identified by the description in Exhibit A attached hereto and made a part hereof. The full legal description of the Real Estate shall be confirmed and stated in the Survey (as hereinafter defined). The Real Estate includes all land, buildings, improvements, fixtures, signage, tenements, hereditaments and appurtenances belonging or in any wise appertaining to such real property, and all of Seller's right, title and interest, if any, in and to (i) any land lying in the bed of any street, road or avenue, open or proposed, in front of or adjoining such real property to the center line thereof to the extent included in the legal description of the Real Estate, but subject to public rights-of-way and easements; (ii) any strips and gores of land adjacent to, abutting or used in connection with such real property; (iii) any easements and rights, if any, inuring to the benefit of such real property or to Seller in connection therewith; (iv) any riparian rights in connection with such real property; and (v) any and all rights in and to any leases, licenses or other assets of any type or nature pertaining to the use of such real property.

(Purchase Agreement ¶ 1(g).)

25.     Burgess Group did not accept OmniSource's indemnity demand.

26.     OmniSource defended itself in the Arbitration, in which the Arbitrator determined, through an interim award, that OmniSource was liable to Louisiana-Pacific in the amount of $2.2M, plus interest and attorney fees. OmniSource ultimately resolved the interest and attorney fee award and incurred a total of $2.6M of liability to Louisiana-Pacific.

27.     Therefore, based on Burgess Group's failure to acknowledge the Track Use Agreement, which it agreed to assume and was bound to honor, and Burgess Group's refusal to indemnify OmniSource as required by the Purchase Agreement, OmniSource incurred $2.6M in damages, plus its own costs and expenses, including attorney fees.

Burgess Corporation fails to perform under the Shredder Agreement.

28.    As part of the Purchase Agreement, Burgess Group agreed, as a condition of closing, to move a shredder (the "Shredder") located on the Property; more specifically, the Purchase Agreement states:

> Buyer's affiliate, Burgess Corporation ("Burgess Corp.") and Seller shall have, contemporaneously with the execution of this Agreement, entered into an agreement for the disassembly (under Seller's supervision) and transport of Seller's shredder and all shredder ancillary equipment from the Real Estate to Seller's facility located in Kernersville, North Carolina and any other Seller facility located within 300 miles of the Real Estate, as determined by Seller, at no cost to Seller, to be off-loaded by Seller, in the form attached hereto as Exhibit C ("Shredder Moving Agreement") and Seller's shredder and all shredder ancillary equipment shall have been moved to another Seller facility pursuant thereto; and (iii) Seller shall have performed all of its obligations referenced in Section 12(b) of this Agreement.

(Purchase Agreement ¶ 10(a)(ii).)

29.    OmniSource and Burgess Corporation entered into the Shredder Moving Agreement (the "Shredder Agreement") on November 22, 2021. A true and correct copy of the Shredder Agreement is attached hereto as "Exhibit E."

30.    Under the Shredder Agreement, Burgess Corporation agreed to perform the Scope of Work attached to that agreement.

31.    The Scope of Work requires Burgess Corporation to "disassemble and transport all of the following equipment and components," and then goes on to list all parts of the Shredder.

32.    The Scope of Work also requires Burgess Corporation to "provide all disassembly, rigging, loading and transportation under OmniSource supervision."

33.    When it became clear that Burgess Corporation and Burgess Group would be unable to comply with the Shredder Moving Agreement, OmniSource and Burgess

Group entered into the Second Amendment and OmniSource and Burgess Corporation entered into the First Amendment to Shredder Moving Agreement (the "Amended Shredder Agreement") on June 15, 2022. A true and correct copy of the Amended Shredder Agreement is attached as "Exhibit F."

34.    Under the Amended Shredder Agreement, Burgess Corporation agreed to "continue with commercially reasonable diligence to complete the Scope of Work as soon as commercially possible after the closing."

35.    In conjunction with the Amended Shredder Agreement, OmniSource, Burgess Group, and Chicago Title Insurance Company entered into the Escrow Agreement for Shredder Moving (the "Shredder Escrow Agreement"). A true and correct copy of the Shredder Moving Agreement is attached as "Exhibit G."

36.    The Escrow Agreement reiterated that it was Burgess Corporation's obligation "to dissemble and transport OmniSource's metal shredder and ancillary shredder equipment . . . from the Real Estate at [Burgess's] sole cost and expense." (Escrow Agreement § B.)

37.    Under the Shredder Escrow Agreement, Burgess Group also agreed to cause Burgess Corporation "to continue, now and after Closing on the sale and purchase of the Real Estate to actively disassemble the Shredder on the Real Estate and remove the Shredder completely from the Real Estate and transport the same to locations determined by OmniSource as soon as commercially possible as required by Burgess Consolidated the Shredder Agreement." (Escrow Agreement § 2.)

38.    As part of the Escrow Agreement, $250,000 was deposited in an escrow account (the "Shredder Escrow Account") for the payment to OmniSource of costs associated with the removal of the Shredder from the Property.

39.     Pursuant to the terms of the Amended Shredder Agreement, OmniSource and Burgess Corporation agreed to the following schedule:

> 1.     **SCHEDULE.** With respect to paragraph 2 of the Agreement, the parties acknowledge that the Scope of Work has not been completed. OmniSource and Buyer are nevertheless proceeding with the closing on the sale of the Real Estate pursuant to the Real Estate Purchase Agreement, as amended, and notwithstanding the closing, Contractor shall continue with commercially reasonable diligence to complete the Scope of Work as soon as commercially possible after the closing. To assist Contractor, OmniSource agrees that with respect to the transportation of certain oversized parts of the Shredder, OmniSource shall arrange for rail transportation from the Real Estate to the designated destinations, at Contractor's expense. Within fifteen (15) days after the date of this Amendment, and, if requested by Contractor, within fifteen (15) days after Contractor's request for more rail cars, OmniSource shall order the rail cars needed to transport the oversized parts of the Shredder. Within fifteen (15) days after the placement of rail cars on the Real Estate, Contractor shall have so many of the parts of the Shredder as will safely and reasonably fit properly loaded on the rail cars and ready for shipment. Contractor shall also continue to load and transport all other parts of the Shredder by truck as soon as commercially possible.

40.     The Amended Shredder Agreement also includes the following remedies provision:

> 2.     **REMEDIES.** The remedy available to OmniSource set forth in paragraph 10(c) of the Agreement is hereby deleted and replaced with the following:
>
> (a)     Satisfy any damages sustained by OmniSource arising from Contractor's Event of Default by payment from the Shredder Escrow deposited by Buyer and held by the Title Company pursuant to the related escrow agreement entered into pursuant to the Real Estate Purchase Agreement, as amended, upon demand made by OmniSource to the Title Company (as the terms "Shredder Escrow" and "Title Company" are defined in the Real Estate Purchase Agreement, as amended).

41.     Burgess Corporation failed to remove the Shredder from the Property in a commercially reasonable timeframe.

42.     The Amended Shredder Agreement also states that "[w]ithin fifteen (15) days after the placement of rail cars on the Real Estate, Contractor shall have so many of the parts of the Shredder as will safely and reasonably fit properly loaded on the rail cars and ready for shipment."

43.     Burgess Corporation did not properly load rail cars within this timeframe.

44.     The Amended Shredder Agreement states that "Contractor shall also continue to load and transport all other parts of the Shredder by truck as soon as commercially possible."

45.     Burgess Corporation did not continue to load and transport these other parts of the Shredder by truck as soon as commercially possible despite repeated suggestions by OmniSource that Burgess Corporation and/or Burgess Group move smaller pieces of the Shredder by truck while continuing to work on the larger pieces that Burgess Corporation and/or Burges Group believed must be moved by rail.

46.     As a result of Burgess Corporation's failure to remove the Shredder, 2830 threatened legal action against OmniSource, thereby causing OmniSource to incur attorney fees and other expenses.

47.     2830's threats triggered Burgess Corporation's indemnity obligations under the Shredder Agreement, which states:

> INDEMNITY. Contractor shall indemnify and hold OmniSource harmless from and against all claims . . . and any and all costs and expenses in connection therewith (including attorneys' fees) arising out of or in any manner connected with its performance of the Scope of Work or with this Agreement.

(Shredder Agreement ¶ 7.)

48.     As a result of Burgess Corporation's failure to timely remove the Shredder, OmniSource incurred considerable loss of time and expense in efforts to help Burgess Corporation remove the Shredder, avoid legal proceedings with 2830, and otherwise minimize OmniSource's damages related to Burgess Corporation's breaches of contract.

49.     OmniSource also incurred significant costs and expenses with the railroad company operating rail service on the track leading to and from the Property in conjunction with the removal of Shredder parts.

3997321 *Complaint for Damages and Declaratory Relief*

**COUNT I:     BREACH OF CONTRACT AND FOR INDEMNITY AGAINST BURGESS GROUP**

50.    OmniSource incorporates the preceding paragraphs.

51.    The Arbitration was a claim against OmniSource predicated upon contract relating to the physical condition of the "Property," as the claims made in the Arbitration relate to "rights in and to any lease, license or other assets of any type or nature pertaining to the use of such real property."

52.    Burgess Group had and has an obligation to defend and indemnify OmniSource with respect to the Arbitration.

53.    Burgess Group failed to accept its indemnity obligations.

54.    Burgess Group is liable to OmniSource for all damages, losses, and expenses incurred by OmniSource related to the Arbitration including all amounts OmniSource is required to pay to Louisiana-Pacific as well as OmniSource's costs and expenses related to the Arbitration.

**COUNT II:     BREACH OF CONTRACT FOR FAILURE TO PERFORM UNDER THE PURCHASE AGREEMENT AGAINST BURGESS GROUP**

55.    OmniSource incorporates the preceding paragraphs.

56.    Burgess Group has failed to perform as required under the Purchase Agreement.

57.    The Purchase Agreement defines "Real Estate" to include "any easements and rights, if any, inuring to the benefit of such real property or to Seller in connection therewith . . . and all rights in and to any leases, licenses or other assets of any type or nature pertaining to the use of such real property." (Purchase Agreement ¶ 1(g).)

58.    The Purchase Agreement also includes the following disclaimer:

8. Sale is "AS IS - WHERE IS, WITH ALL FAULTS".

(a) Buyer acknowledges and agrees to purchase the Property "as is - where is, with all faults", it being understood that except as specifically set forth herein, Seller or its agents have made no warranty or representation of any kind, expressed or implied, pertaining to the Property, the condition thereof (environmental or otherwise), the rental value thereof or any other matter pertaining to the Property, and Seller further disclaims any such warranty or representation, including without limitation:

(xi) The leases, service contracts, or other agreements (if any) affecting the

Real Estate . . .

59.    Similarly, the Warranty Deed by which OmniSource transferred the property to Burgess Group states that the Property is transferred with "all easements, rights of way, privileges, licenses, hereditaments, appurtenances and all other rights and benefits appurtenant or in any way related to, and/or demised under any lease of or other context or agreement for the use of the aforesaid land."

60.    Therefore, OmniSource transferred the Track Use Agreement to Burgess Group.

61.    Under both the Purchase Agreement and the Warranty Deed, Burgess Group took the Property subject to the Track Use Agreement.

62.    Burgess Group failed to transfer the Property to 2830 in a manner that ensured 2830 would be similarly bound by the Track Use Agreement.

63.    Burgess Group, therefore, breached the Track Use Agreement (which it assumed) and/or the Purchase Agreement.

64.    OmniSource has incurred losses, damages, and expenses because of Burgess Group's breach.

**COUNT III:   BREACH OF ORAL CONTRACT TO ASSUME TRACK USE AGREEMENT**

65.    OmniSource incorporates the preceding paragraphs.

3997321 *Complaint for Damages and Declaratory Relief*

66.    Vince Burgess, the principal of Burgess Group, agreed to assume the Track Use Agreement.

67.    OmniSource relied on this agreement.

68.    Burgess Group failed and/or refused to honor its agreement to assume the Track Use Agreement.

69.    OmniSource was harmed by this breach of agreement as the failure of Burgess Group to assume and abide by the Track Use Agreement led to the Arbitration and the related damages and expenses.

70.    Burgess Group is liable to OmniSource for all its damages and expenses related to Burgess Group's breach of the oral agreement to assume the Track Use Agreement.

**COUNT IV:    BREACH OF CONTRACT REGARDING SHREDDER AGREEMENT AND ESCROW AGREEMENT**

71.    OmniSource incorporates the preceding paragraphs.

72.    Burgess Group and Burgess Corporation had the contractual obligation to remove or cause to be removed the Shredder from the Property in a commercially reasonable timeframe.

73.    The Shredder was not removed from the Property in a commercially reasonable timeframe.

74.    Burgess Group and/or Burgess Corporation had the obligation to, within fifteen days after the placement of rail cars on the Property, have so many of the parts of the Shredder as will safely and reasonably fit properly loaded on the rail cars and ready for shipment.

75.    Rail cars were not properly loaded within this timeframe.

76.     Burgess Group and/or Burgess Corporation also had the obligation to load and transport smaller parts of the Shredder by truck as soon as commercially possible.

77.     These other parts of the Shredder were not moved by truck as soon as commercially possible.

78.     OmniSource incurred costs, expenses, and damages as a result of the breaches by Burgess Group and Burgess Corporation.

**COUNT V:    REQUEST FOR DECLARATORY RELIEF REGARDING ESCROW FUNDS**

79.     OmniSource incorporates the preceding paragraphs.

80.     OmniSource has incurred expenses regarding the removal of the Shredder.

81.     These expenses are, pursuant to the terms of the Shredder Agreement, Amended Shredder Agreement, and Escrow Agreement, reimbursable to OmniSource from the funds in the Escrow Account.

82.     As of the filing of this Complaint, the funds initially deposited in the Escrow Account remain in the Escrow Account.

83.     In addition to all other damages recoverable based on breaches of the Shredder Agreement, Amended Shredder Agreement, and Escrow Agreement, OmniSource is entitled to a declaratory judgment determining that OmniSource is entitled to the funds in the Escrow Account.

WHEREFORE, OmniSource requests judgment against Burgess Corporation and Burgess Group in an amount sufficient to compensate OmniSource for its damages, losses, and expenses, including its attorney fees, a declaration that OmniSource is entitled to receive the funds in the Escrow Account, and all other just and proper relief.

Respectfully submitted,

BARRETT MCNAGNY LLP

*/s/ William A. Ramsey*
William A. Ramsey #26547-53
215 East Berry Street
Fort Wayne, Indiana 46802
Telephone: (260) 423-9551
Email: war@barrettlaw.com

*Attorneys for Plaintiff OmniSource, LLC*

15

USDC IN/ND case 1:24-cv-00093-DRL-SLC   document 6   filed 01/22/24   page 16 of 83

02D02-2401-PL-000027
Allen Superior Court 2

Filed: 1/22/2024 2:43 PM
Clerk
Allen County, Indiana
BB

## REAL ESTATE SALE AND PURCHASE AGREEMENT

THIS REAL ESTATE SALE AND PURCHASE AGREEMENT (this "Agreement") is made by and between OMNISOURCE, LLC, an Indiana limited liability company, successor by merger to OmniSource Southeast, LLC, a Delaware limited liability company (formerly known as Recycle South, LLC), successor by merger to Atlantic Scrap and Processing – Wilmington, LLC, a North Carolina limited liability company ("Seller"), and BURGESS GROUP CONSOLIDATED, LLC, a North Carolina limited liability company ("Buyer").

PRELIMINARY STATEMENT:

Seller owns and holds fee simple title to the Property (as hereinafter defined).  Seller is willing to sell the Property to Buyer, and Buyer is willing to purchase the Property from Seller, upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.      Definitions.  Certain terms used herein are defined in this Section 1; other terms are defined elsewhere within the text of this Agreement.

(a)      "Closing" shall mean the consummation of the purchase and sale of the Property in accordance with the terms of this Agreement upon completion of all conditions precedent herein required.

(b)      "Effective Date" shall mean the date upon which the last of Buyer and Seller has executed an original of this Agreement indicating each party's unequivocal acceptance of the terms and conditions hereof.

(c)      "Permitted Exceptions" shall mean (i) the usual conditions, stipulations and exceptions contained in standard owner's policies issued by the Title Company; (ii) ad valorem taxes for the year of Closing, prorated on a calendar year basis as further provided herein; (iii) public roads, streets and alleys on any part of the Real Estate; (iv) the unrecorded Existing Lease pursuant to Section 6(e); and (v) any matter that is deemed to be a Permitted Exception under Section 6(c).

(d)      "Purchase Price" shall mean the Purchase Price for the Property in the sum of Four Million Five Hundred Thousand and No/100 Dollars ($4,500,000.00).

(e)      "Personal Property" shall mean an in-ground truck scale and electrical substation, pad-mounted transformers, and related electrical switch gear equipment located on the Real Estate.

(f)      "Property" shall mean the Real Estate and Personal Property.

3028012.8

- 1 -

Exhibit A

(g)    "Real Estate" shall mean the real property located in New Hanover County, North Carolina, commonly known as 2830 U.S. Highway 421 N, Wilmington, North Carolina, as presently identified by the description in Exhibit A attached hereto and made a part hereof. The full legal description of the Real Estate shall be confirmed and stated in the Survey (as hereinafter defined). The Real Estate includes all land, buildings, improvements, fixtures, signage, tenements, hereditaments and appurtenances belonging or in any wise appertaining to such real property, and all of Seller's right, title and interest, if any, in and to (i) any land lying in the bed of any street, road or avenue, open or proposed, in front of or adjoining such real property to the center line thereof to the extent included in the legal description of the Real Estate, but subject to public rights-of-way and easements; (ii) any strips and gores of land adjacent to, abutting or used in connection with such real property; (iii) any easements and rights, if any, inuring to the benefit of such real property or to Seller in connection therewith; (iv) any riparian rights in connection with such real property; and (v) any and all rights in and to any leases, licenses or other assets of any type or nature pertaining to the use of such real property.

(h)    "Seller Affiliated Parties" shall mean Seller and any and all of Seller's predecessors, parent and subsidiary entities, affiliates, directors, officers, shareholders, members, employees, agents, tenants, contractors, assigns, and successors.

(i)    "Title Commitment" shall mean the title commitment to be issued by the Title Company in which the Title Company will commit itself to issue to Buyer an Owner's Policy of Title Insurance (2006 ALTA Owner's Policy Form) upon demand, in the full amount of the Purchase Price, setting forth the current state of the title to the Real Estate and showing that Seller can convey to Buyer good and marketable fee simple title and subject only to the Permitted Exceptions.

(j)    "Title Company" shall mean an American Land Title Association ("ALTA") title insurance company reasonably satisfactory to Buyer.

2.    <u>Sale and Purchase of Property</u>.  Subject to the terms, provisions and conditions set forth herein, Seller hereby agrees to sell the Property to Buyer, and Buyer hereby agrees to purchase the Property from Seller.

3.    <u>Purchase Price for the Property</u>.

(a)    <u>Payment</u>.    The Purchase Price for the Property, subject to such adjustments, credits, deductions and prorations as herein may be required, shall be paid to the Title Company by wire transfer of immediately available funds on the date of Closing.

(b)    <u>Earnest Money</u>.  Buyer shall deposit Buyer's cashiers check or other readily available funds payable to the Title Company in the amount of Four Hundred Fifty Thousand and No/100 Dollars ($450,000.00) as earnest money ("Earnest Money") within five (5) business days after the Effective Date, to be applied to the Purchase Price at Closing or as otherwise provided in this Agreement. If Buyer fails to deliver the Earnest Money in the time required, this Agreement shall be deemed null and void and neither party shall have any further obligation to the other party.

Exhibit A

4.    Restrictive Covenants as to Use of Real Estate.    In addition to Seller's conditions set forth in Section 10(b) of this Agreement, as a condition to Seller agreeing to enter into this Agreement and to sell the Real Estate hereunder, Seller has insisted that Buyer agree to the imposition of certain restrictions and covenants upon the Real Estate and Buyer has agreed to permit such restrictions and covenants to be imposed on the Real Estate.  Seller would not have agreed to sell the Real Estate in the absence of these restrictions and covenants by Buyer, and Seller has materially relied upon such restrictions and covenants in agreeing to sell the Real Estate.  Accordingly, Buyer shall allow Seller to impress upon the Real Estate by a separate recordable document in the form attached hereto as Exhibit B prior to acceptance and recording of the Deed, certain restrictions and covenants ("Restrictive Covenants") which the Buyer shall sign its acceptance of and which shall run with the Real Estate and be binding upon Buyer, future owners of the Real Estate, and anyone claiming under them, and which shall be enforceable by Seller and its successors and assigns.

5.    Satisfaction and Waiver with respect to Property Condition.  Pursuant to a certain Limited Access Agreement dated June 3, 2021, as amended by a First Amendment to Limited Access Agreement dated August 30, 2021, a Second Amendment to Limited Access Agreement dated September 24, 2021, and a Third Amendment to Limited Access Agreement dated October 28, 2021, by and between Seller and Buyer (collectively, the "Access Agreement"), Buyer has had access to the Property to conduct environmental and non-environmental due diligence for more than one hundred twenty (120) days prior to the Effective Date, and Buyer has satisfied itself with the condition of the Property and expressly waives any right to terminate this Agreement based upon any matter or condition that was or could have been inspected or discovered pursuant to the Access Agreement.

6.    Title and Survey; Existing Lease.

(a)    Not later than three (3) business days after the Effective Date hereof, Buyer shall order at Seller's expense and upon receipt promptly deliver to Seller a Title Commitment issued by the Title Company.

(b)    Buyer may order an ALTA survey of the Real Estate ("Survey") within ten (10) business days after the Effective Date and obtain the same within eight (8) weeks after the Effective Date.  Buyer shall pay the cost of the Survey if obtained. Buyer shall order the Survey from a surveyor licensed in the state where the Real Estate is located.  If Buyer does not receive the Survey within the applicable time period required in this subsection, Buyer shall be deemed to have waived Buyer's right to obtain the Survey or to object to any matters based on the Survey as provided in Section 6(c).  Upon receipt of the Survey, Buyer shall promptly deliver a copy of the Survey to Seller.

(c)    Within five (5) business days after Buyer's receipt of the last to be received of the Title Commitment and Survey (but if the Survey is not received within the time required, then within five (5) business days after the date by which it was required to be obtained), Buyer shall notify Seller in writing of any objections it may have with respect to any matters shown in the Title Commitment or the Survey (if the Survey was timely obtained).  In

3028012.8

- 3 -

Exhibit A

the absence of such written notification, Buyer shall be deemed to have automatically approved the Title Commitment and the Survey, if any. If the Buyer timely objects (as provided above) to any matter, then Seller shall have ten (10) business days from receipt of Buyer's objection ("Title Cure Period") within which to cure any such defects and/or remove any such objections and to furnish a later dated Title Commitments showing such defects or objections, as the case may be, cured or removed or to provide Buyer written notice that Seller elects not to remove or cure any such defects or objections. As to any mortgages, liens or other monetary encumbrances (collectively, the "Monetary Encumbrances") objected to by Buyer which cannot be cured until Closing (such as the payoff and satisfaction of a mortgage), Seller shall commit to said cure during the Title Cure Period and shall complete said cure at Closing. Seller shall further be obligated to cure such title defects disclosed in any update to the Title Commitment obtained by Buyer first arising or occurring from conditions coming into existence and caused solely by Seller from and after the effective date of the original Title Commitment ("Update Title Defects"). If such defects or objections (other than Monetary Encumbrances and Update Title Defects) are not cured or removed, as the case may be, within the Title Cure Period, Buyer shall elect within five (5) business days after the expiration of the Title Cure Period either to terminate this Agreement or to accept the title as it then is (without the right to deduct any amount from the Purchase Price) by giving Seller written notice of such election. In the absence of Seller's receipt of Buyer's notice of election within five (5) business days after the expiration of the Title Cure Period, Buyer shall be deemed to have waived any such defects and/or objections. Seller shall not be required to bring any action or proceeding or otherwise to incur any expense to render the title to the Real Estate good, other than to cure at or before Closing such Monetary Encumbrances to which Buyer has timely objected.

(d)    Title to the Real Estate shall be conveyed to Buyer by a special warranty deed ("Deed"), duly executed and acknowledged by Seller and recorded by the Title Company at the Closing, subject to the Permitted Exceptions described in Section 1(c) hereof.

(e)    Existing Lease. Seller currently leases a portion of the Real Estate to Colonial Materials of Fayetteville, Inc. ("Tenant"), and Buyer is willing to accept title to the Real Estate subject to such lease ("Existing Lease"). At or before Closing, Seller and Buyer shall each execute and deliver to the other an assignment and assumption of lease for the Existing Lease ("Existing Lease Assignment") in a form reasonably acceptable to Seller and Buyer. The Existing Lease Assignment shall be acknowledged by Tenant and therein Tenant shall confirm that there are no defaults under the Existing Lease. Any unapplied security deposit held by Seller and which was made by the Tenant under the Existing Lease shall be credited to Buyer at Closing. All rent received by Seller in advance under the Existing Lease for a period of time which includes a period after the date of Closing shall be prorated as of the date of Closing.

7.    Covenants, Warranties and Representations.

(a)    Seller's Covenants, Warranties and Representations. Seller hereby covenants, warrants and represents that:

(i)    Seller is a duly authorized and validly existing limited liability company organized under the laws of the State of Indiana;

Exhibit A

(ii)    Seller has all necessary power and authority to enter into this Agreement, to consummate the transactions contemplated hereby, and to perform the obligations hereunder, and this Agreement has been duly authorized, executed and delivered by Seller and is the legal, valid, and binding obligation of Seller, enforceable against Seller in accordance with its terms;

(iii)    Seller is not a foreign person or entity and agrees that the certification required by the Foreign Investment Real Property Tax Act will be provided to Buyer on the date of Closing, in that Section 1445 of the Internal Revenue Code provides that the transferee of a United States real property interest must deduct and withhold a tax equal to ten percent (10%) of the amount realized by the transferor on the disposition, if the transferor is a foreign person or entity;

(iv)    Neither the execution of this Agreement nor the performance by Seller of the obligations of this Agreement shall conflict with, constitute a default of, or result in a breach or violation of any law, statute, rule or regulation applicable to itself or any material agreement, contract, note, mortgage, instrument, judgment, order, award or decree to which Seller is a party or by which the Real Estate is bound, or require any approval, consent, authorization or other action by any court, governmental authority, agency or regulatory body or any creditor of Seller or any other person or entity;

(v)    The Existing Lease is the only lease, possessory agreement or other occupancy agreement applicable to the Property; and

(vi)    To Seller's knowledge, there are no actions, suits or proceedings of any kind or nature whatsoever, legal or equitable, affecting the Property, or any portion or portions thereof, or relating to or arising out of Seller's ownership of the Property, in any court or before or by any federal, state, county or municipal department, commission, board, bureau or agency or other governmental instrumentality.

(b)    Buyer's Warranties and Representations.    Buyer hereby warrants and represents that:

(i)    Buyer is a duly authorized and validly existing limited liability company organized under the laws of the State of North Carolina;

(ii)    Buyer has all necessary power and authority to enter into this Agreement, to consummate the transactions contemplated hereby, and to perform the obligations hereunder, and this Agreement has been duly authorized, executed and delivered by Buyer and is the legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with its terms; and

(iii)    Neither the execution of this Agreement nor the performance by Buyer of the obligations of this Agreement shall conflict with, constitute a default of, or result in a breach or violation of any law, statute, rule or regulation applicable to Buyer or any material agreement, contract, note, mortgage, instrument, judgment, order, award or decree to which

Exhibit A

Buyer is a party, or require any approval, consent, authorization or other action by any court, governmental authority, agency or regulatory body or any creditor of Buyer or any other person or entity.

     8.    <u>Sale is "AS IS - WHERE IS, WITH ALL FAULTS"</u>.

     (a)    Buyer acknowledges and agrees to purchase the Property "as is - where is, with all faults", it being understood that except as specifically set forth herein, Seller or its agents have made no warranty or representation of any kind, expressed or implied, pertaining to the Property, the condition thereof (environmental or otherwise), the rental value thereof or any other matter pertaining to the Property, and Seller further disclaims any such warranty or representation, including without limitation:

     (i)    The quality, nature, adequacy and physical condition of the Real Estate, including, but not limited to, appurtenances, access, landscaping, parking facilities, and the electrical, mechanical, plumbing, sewage, utility systems, facilities and appliances;

     (ii)    The quality, nature, adequacy, and physical condition of soils, geology and any groundwater in or around the Real Estate;

     (iii)    The existence, quality, nature, adequacy and physical condition of utilities serving the Real Estate;

     (iv)    The Real Estate's use, habitability, merchantability, or fitness, suitability, value or adequacy of the Real Estate for any particular purpose;

     (v)    The zoning or other legal status of the Real Estate or any other public restrictions on use of the Real Estate;

     (vi)    The economics of the operation of the Real Estate;

     (vii)    The compliance of the Real Estate or their operation with any applicable codes, laws, regulations, statutes, ordinances, covenants, conditions and restrictions of any governmental or quasi-governmental entity or of any other person or entity;

     (viii)    The presence, absence or removal of hazardous or toxic materials, substances or wastes on, under or about the Real Estate or the adjoining or neighboring property;

     (ix)    The quality of any labor and materials used in any improvements on the Real Estate;

     (x)    The condition of the title to the Real Estate;

     (xi)    The leases, service contracts, or other agreements (if any) affecting the Real Estate;

Exhibit A

(xii)    The accuracy or completeness of any documents, materials, data, or information delivered by Seller to Buyer with respect to the Real Estate; and

(xiii)    The merchantability, fitness, suitability, value or adequacy of the Personal Property for any particular purpose.

(b)    Further, Buyer acknowledges that a part or all of the Property may be in a deteriorating condition, and as part of the consideration for Seller entering into this Agreement with Buyer, Buyer covenants and agrees, effective as of the date of Closing, to save and hold harmless Seller for, from and against any and all loss, claim or injury arising after closing from Seller permitting such condition to arise or exist.

9.    <u>Waiver, Release and Indemnity</u>.

(a)    As used in this Section 9, the following terms apply:

(i)    "Environmental Law" shall mean any federal, state, or local law concerning the investigation, assessment, remediation, or corrective action of hazardous substances, petroleum, hazardous wastes, or other contaminants, and includes, but is not limited to: the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. Section 9601 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. Section 6901 et seq.), the Emergency Planning and Community Right-to-Know Act (42 U.S.C. Section 11001 et seq.), the Oil Pollution Act (33 U.S.C. Section 2701 et seq.), the Federal Water Pollution Control Act (33 U.S.C. Section 1251 et seq.), the Clean Air Act (42 U.S.C. Section 7401 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. Section 1471 et seq.), the Toxic Substances Control Act (15 U.S.C. Section 2601 et seq.), the Safe Drinking Water Act (42 U.S.C. Section 300f et seq.), the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. Section 163 et seq.), the Atomic Energy Act (42 U.S.C. Section 2011 et seq.), and the Nuclear Waste Policy Act (42 U.S.C. Section 10101 et seq.), all as amended from time to time, and any similar statutes, regulations, ordinances, and other laws, be they federal, state, local, or from any other applicable jurisdiction.

(ii)    "Claims" shall mean any and all losses, damages, costs, fees, fines, penalties, liabilities, causes of or choses in action, or other claims, regardless of whether liability is predicated upon tort, contract, strict liability, warranty, any Environmental Law, or any other legal or equitable theory, relating to the physical or environmental condition of the Property, including without limitation any hazardous substances, petroleum, hazardous wastes, or other contaminants released on, at, or near the Property or at, on, in, under, entering on to or emanating from the Property. The term "Claims" shall also include claims based on a breach of or failure to perform under this Agreement.

(b)    Buyer (for itself and its predecessors, successors, affiliates, principals, shareholders, transferees, and assigns) waives and releases any and all Claims that Buyer had, now has or may have in the future against one or more of the Seller Affiliated Parties, and Buyer further covenants and agrees not to commence any action, suit, petition, or other proceeding or seek any other legal or equitable remedy against any Seller Affiliated Parties for any Claims.

Exhibit A

Buyer covenants and agrees to indemnify, defend and hold harmless the Seller Affiliated Parties from any Claims, and pay any and all costs, including reasonable attorneys' fees, in connection with such Claims. Buyer shall assume any judgment or settlement arising from a Claim in its entirety and defend, indemnify, and hold harmless the Seller Affiliated Parties. This covenant and agreement of Buyer shall survive Closing.

      10.    <u>Conditions to Closing</u>.

      (a)    <u>Buyer's Conditions</u>. The obligations of Buyer to consummate the Closing under this Agreement are subject to the satisfaction as of the date of Closing of the following conditions (all or any of which may be waived in whole or in part by Buyer in its sole discretion):

      (i)    All warranties, representations and covenants given by Seller herein, or in any document, instrument or exhibit to be given or furnished by Seller, shall be true and correct and not have been breached on and as of the date of Closing as if made on that date;

      (ii)    Buyer's affiliate, Burgess Corporation ("Burgess Corp.") and Seller shall have, contemporaneously with the execution of this Agreement, entered into an agreement for the disassembly (under Seller's supervision) and transport of Seller's shredder and all shredder ancillary equipment from the Real Estate to Seller's facility located in Kernersville, North Carolina and any other Seller facility located within 300 miles of the Real Estate, as determined by Seller, at no cost to Seller, to be off-loaded by Seller, in the form attached hereto as <u>Exhibit C</u>  ("Shredder Moving Agreement") and Seller's shredder and all shredder ancillary equipment shall have been moved to another Seller facility pursuant thereto; and

      (iii)    Seller shall have performed all of its obligations referenced in Section 12(b) of this Agreement.

      (b)    <u>Seller's Conditions</u>. The obligations of Seller to consummate the Closing under this Agreement are subject to the satisfaction as of the date of Closing of the following conditions (all or any of which may be waived in whole or in part by Seller in its sole discretion):

      (i)    All warranties, representations and covenants given by Buyer herein, or in any document, instrument or exhibit to be given or furnished by Buyer, shall be true and correct and not have been breached on and as of the date of Closing as if made on that date;

      (ii)    Burgess Corp. and Seller shall have entered into the Shredder Moving Agreement and Seller's shredder and all shredder ancillary equipment shall have been moved to another Seller facility pursuant thereto; and

      (iii)    Buyer shall have performed all of its obligations referenced in Section 12(c) of this Agreement.

Exhibit A

11. <u>Taxes and Prorations</u>. Unless otherwise mutually agreed in writing between Seller and Buyer, the following closing adjustments between Seller and Buyer shall be made by the Title Company as part of the Closing:

(a) State and county real estate transfer tax (including stamp taxes) and any similar taxes, if any, with respect to deeds, bills of sale, assignments and other instruments of transfer to be executed and delivered by Seller, shall be paid by Seller;

(b) All recording fees arising from the recordation of documents necessary to show that title to the Real Estate is in Seller's name shall be paid by Seller, or credited to Buyer against the Purchase Price, and all other recording fees shall be paid by Buyer;

(c) State, county and local real estate taxes and special assessments which are liens on the Real Estate and billed and due in a year prior to the year of Closing shall be paid for by Seller. State, county and local real estate taxes and special assessments which are liens on the Real Estate and due in the calendar year in which the Closing occurs shall be prorated between the parties hereto on a calendar year basis and on the basis of the most recent ascertainable tax information at the time of Closing. All installments under any special assessment against the Real Estate for a fixed or readily ascertainable amount as of the Closing shall be paid in full by the Seller at Closing, unless they are first assessed after the Effective Date hereof, in which event they shall be prorated as of the date of Closing and any such installments for future calendar years shall be paid when due by Buyer. Notwithstanding the foregoing, if any assessment relates to Buyer's contemplated improvements, then Buyer shall be solely responsible for the payment of same regardless of when assessed;

(d) All premiums and other charges for the issuance of the Title Policy shall be borne by Seller, and the fee charged for providing closing services by Title Company shall be borne equally by Buyer and Seller. Buyer shall pay for any additional premium charges for an extended title insurance policy (including the cost of any title endorsements), if so elected by Buyer, beyond those for a standard policy;

(e) All closing costs not otherwise addressed in this Section 11 or elsewhere in this Agreement shall be borne equally by Buyer and Seller; and

(f) Surcharges, utility charges and other normally prorated operating expenses billed or paid as of the date of Closing shall be an adjustment made on the date of Closing and handled on the closing statement. Notwithstanding the foregoing, Seller and Buyer shall cooperate in a commercially reasonable manner to have utilities switched from the account of Seller to the account of Buyer on the date of Closing in order that Seller will be billed directly by the utility provider for such utilities consumed through the date of Closing and Buyer will be billed directly by the utility provider for such utilities consumed beginning after the date of Closing.

12. <u>Closing</u>.

(a) <u>Closing Date</u>. Provided this Agreement has not been terminated as

Exhibit A

allowed herein and all conditions set forth in Section 10 hereof or elsewhere herein have been satisfied or waived, the Closing shall take place on or before eighty (80) business days after the end of the Title Cure Period, or on an earlier date not less than ten (10) business days after Buyer sends to Seller written notice that Buyer is ready, willing and able to close. Unless agreed otherwise, Seller and Buyer shall conduct an escrow-style closing through the Title Company in order that it will not be necessary for either party to physically attend Closing (Seller and Buyer shall work with each other in good faith to finalize and sign all documents not later than the day prior to Closing and deliver such items to the Title Company).

        (b)    <u>Seller's Obligations at Closing</u>.  At or prior to the date of Closing, Seller shall:

        (i)    Execute and deliver to Buyer the Deed, subject only to the Permitted Exceptions;

        (ii)    Cause to be delivered to Buyer the Title Policy, or pro forma Title Policy or a suitably marked-up copy of the Title Commitment which irrevocably commits the Title Company to issue the Title Policy to Buyer in the form required hereunder, listing only the Permitted Exceptions as title exceptions;

        (iii)    Execute and deliver a vendor's affidavit, in favor of Buyer and the Title Company, averring that with respect to the Real Estate, other than the Permitted Exceptions, there are no rights or claims of parties in possession of the Real Estate claiming by, through or under Seller, that there are no outstanding unsatisfied judgments docketed or tax liens filed in the official records of the county and state in which the Real Estate is located, that there are no bankruptcies against or involving Seller, that, to Seller's actual knowledge, there are no liens, or rights to a lien, for services, labor, materials furnished for or at the instance of Seller, and containing such other statements as are contained in the form reasonably and customarily required by the Title Company;

        (iv)    Execute and deliver the non-foreign certificate or affidavit of Seller confirming that Seller is not a "foreign person or entity" within the meaning of Section 1445 of the Internal Revenue Code;

        (v)    Execute and deliver the closing statement;

        (vi)    Execute and deliver the Restrictive Covenants;

        (vii)    Execute and deliver a Bill of Sale for transfer of the Personal Property "AS IS – WHERE IS, WITH ALL FAULTS", except as to free and clear title, and otherwise in a form reasonably satisfactory to Seller and Buyer;

        (viii)    Execute and deliver the Existing Lease Assignment; and

        (ix)    Execute and deliver such other documents, including all authority documents, resolutions and consents, as reasonably may be required to effectuate the Closing.

Exhibit A

(c)    <u>Buyer's Obligations at Closing</u>.  At or prior to the date of Closing, and subject to the terms, conditions, and provisions hereof and the performance by Seller of its obligations as set forth herein, Buyer shall:

(i)    Deliver the Purchase Price to Seller pursuant to Section 3 of this Agreement;

(ii)    Execute the closing statement;

(iii)    Execute and deliver its consent to the Restrictive Covenants;

(iv)    Execute and deliver the Existing Lease Assignment; and

(v)    Execute and deliver such other documents, including all authority documents, resolutions and consents, as reasonably may be required to effectuate the Closing.

(d)    <u>Closing Costs</u>.  The following costs and expenses shall be paid as follows in connection with the Closing:

(i)    Seller shall pay:

(1)    All state and county conveyance fees or taxes imposed on the transfer;

(2)    All taxes and special assessments allocated to Seller as provided in Section 11;

(3)    The cost of recording the satisfaction of any existing mortgage and any other document necessary to make title marketable;

(4)    The cost of the Title Commitment and the Title Policy;

(5)    The cost of recording the Restrictive Covenants;

(6)    One-half (1/2) of any closing services fee to be charged by the Title Company;

(7)    Seller's attorneys' fees; and

(8)    Such other costs and expenses of Seller required by this Agreement.

(ii)    Buyer shall pay:

- 11 -

Exhibit A

(1)    The cost of the Survey;

(2)    The cost of any title endorsements to the Title Policy requested by Buyer;

(3)    The cost of recording the Deed;

(4)    One-half (1/2) of any closing services fee to be charged by the Title Company;

(5)    Buyer's attorneys' fees; and

(6)    Such other costs and expenses of Buyer required by this Agreement.

13.    Remedies for Breach of this Agreement.

(a)    If this Agreement becomes effective and Buyer, having no right or option to terminate this Agreement, fails to complete the purchase as provided in this Agreement, Buyer shall forfeit, and Seller shall have the right to receive and the Title Company shall pay to the Seller, the Earnest Money, together with any interest earned thereon, held by the Title Company, not as a penalty, but for full liquidation of damages, the parties declaring and agreeing that such is and represents a reasonable forecast and settlement of such damages of Seller.  Buyer and Seller agree that the payment to Seller of such Earnest Money shall be in lieu of any other relief to which the Seller might otherwise be entitled by virtue of this Agreement or by operation of law or otherwise, and shall represent Seller's sole and exclusive remedy for such breach by Buyer.

(b)    If this Agreement becomes effective and Seller, having no right or option to terminate this Agreement, fails or refuses to complete the sale as provided in this Agreement, then the Title Company shall return all Earnest Money to Buyer, together with any interest earned thereon.  The parties further agree that if Seller fails or refuses to complete the sale as provided in this Agreement, Seller shall pay to Buyer the sum of its reasonable attorneys' fees, architectural fees, environmental costs, due diligence costs, property inspection expenses, and Survey cost relating to this Agreement and the purchase of the Property (collectively "Expenses"), provided that all such Expenses shall have been incurred to unaffiliated third parties, shall be evidenced by invoices from such third parties and proof of payment by Buyer to the reasonable satisfaction of Seller, and shall not exceed in total Ten Thousand and No/100 Dollars ($10,000.00), not as a penalty, but for full liquidation of damages, the parties declaring and agreeing that such is and represents a reasonable forecast and settlement of such damages of Buyer.

(c)    Notwithstanding any other provision of this Agreement, Seller and Buyer agree that if Burgess Corp. should default under the Shredder Moving Agreement, Seller shall be entitled to, and Buyer shall forfeit, and the Title Company shall promptly disburse to Seller upon demand, so much of the Earnest Money (up to and including all of the Earnest Money) necessary

Exhibit A

to satisfy any damages sustained by Seller arising from such default. Under no circumstances shall any such Earnest Money disbursed to Seller be applied against the Purchase Price.

14.    Notices.  Any notices, elections, requests and other communications to be given hereunder may be served by a party or its attorney and shall be in writing and shall be deemed sufficiently given when personally delivered or when deposited in the United States mail, postage prepaid, certified or registered, or when delivered to a nationally recognized overnight courier service with guaranteed next business day delivery and addressed as follows (or to such other person, or to such other address, of which any party hereto shall have given written notice as provided herein):

IF TO BUYER:    Burgess Group Consolidated, LLC
605 Warsaw Road
Clinton, NC 28328
Attention: Vince Burgess, Manager

IF TO SELLER:    OmniSource, LLC
7575 W. Jefferson Blvd.
Fort Wayne, IN 46804
Attention: G. Scott Gibble, Executive Vice President

WITH A COPY TO:    Barrett McNagny LLP
215 East Berry Street
Fort Wayne, IN 46802
Attention: David R. Steiner, Esq.

15.    Brokerage Commission.  Seller represents to Buyer that Seller has engaged William E. Leonard of Cape Fear Commercial and W. Dustin Looper of Resource Commercial Real Estate, LLC (collectively, "Seller's Broker") as Seller's agent in connection with the sale of the Property.  Buyer represents to Seller that Buyer has not engaged any agent or broker as its agent in connection with the purchase of the Property.  Conditioned upon the closing of this transaction and Buyer's payment of the Purchase Price, Seller agrees to pay a commission equal to four percent (4%) of the Purchase Price (.04 x $4,500,000 = $180,000.00) to Seller's Broker as full and entire compensation for all services rendered or expenses incurred by Seller's Broker in connection with the sale of the Property and the Closing.  The commission paid to the Seller's Broker shall be deducted from the Purchase Price and shown on the closing statement signed by the Seller and Buyer at Closing.   Seller and Buyer agree that each will indemnify, defend and hold the other free and harmless from the claims of any other broker(s), representative(s), employee(s), agent(s) or other intermediary(ies) claiming to have represented Seller or Buyer, respectively, or otherwise to be entitled to compensation in connection with this Agreement or in connection with the sale of the Property.  This mutual indemnity shall survive Closing and any earlier termination of this Agreement.

16.    Eminent Domain.  In the event that, prior to the date of the Closing, Seller acquires knowledge of any pending or threatened claim, suit or proceeding to condemn or take all or any part of the Property under the power of eminent domain, then Seller shall immediately

Exhibit A

give notice thereof to Buyer, and Buyer shall have the right to terminate its obligations under this Agreement without liability by delivering notice thereof to Seller within ten (10) days after receiving notice from Seller of such condemnation or taking, and thereupon rights and obligations of the parties hereto shall cease.  If Buyer shall not elect to terminate this Agreement pursuant to this Section 16, the parties shall proceed with the Closing in accordance with the terms hereof without abatement of the Purchase Price, but all proceeds of any condemnation award shall be payable solely to Buyer, and Seller shall have no interest therein.

17.    Miscellaneous.

(a)    Assignment.  Buyer may not directly or indirectly assign or transfer any of Buyer's rights, obligations and interests under this Agreement, to any person or entity without the prior written consent of Seller, which consent will not be unreasonably withheld, conditioned, or delayed.

(b)    Agreement Binding.  This Agreement shall be binding upon and shall inure to the benefit of Seller and Buyer and their respective nominees, heirs, personal representatives, successors and assigns.

(c)    Headings and Captions.  The several headings and captions of the Sections and Subsections used herein are for convenience or reference only and shall, in no way, be deemed to limit, define or restrict the substantive provisions of this Agreement.

(d)    Entire Agreement.  This Agreement constitutes the entire agreement of Buyer and Seller with respect to the purchase and sale of the Property and supersedes any prior or contemporaneous agreement with respect thereto.  No amendment or modification of this Agreement shall be binding upon the parties unless made in writing and signed by Seller and Buyer.

(e)    Cooperation.  Buyer and Seller shall cooperate fully with each other to carry out and effectuate the purchase and sale of the Property in accordance herewith and the satisfaction and compliance with all of the conditions and requirements set forth herein.  Wherever the approvals of Buyer or Seller as herein set forth are so required, such approvals shall not unreasonably be withheld.

(f)    Casualty Loss.  Risk of loss by damage or destruction to the Property prior to the Closing shall be borne by Seller.  If the Property is damaged by fire or other casualty prior to the Closing, Buyer may either (i) terminate this Agreement by written notice to Seller within ten (10) days after Buyer receives from Seller written notice of the occurrence of such casualty, or (ii) proceed to the Closing and accept the condition of the Property without any adjustment in the Purchase Price.

(g)    Governing Law.  This Agreement and the rights of the parties hereunder shall be governed by and construed in accordance with the laws of the State of North Carolina.

Exhibit A

(h)    Business Days.    If any date set forth for the performance of any obligations by Seller or Buyer or for the delivery of any instrument or notice as herein provided shall fall on a Saturday, Sunday or Legal Holiday (as hereinafter defined), the compliance with such obligations or delivery shall be deemed acceptable on the next business day following such Saturday, Sunday or Legal Holiday.  As used herein, the term "Legal Holiday" shall mean any local or federal holiday on which post offices are closed in the State of North Carolina.

(i)    Execution.    The exchange of copies of this Agreement and of signature pages by facsimile or electronic transmission shall constitute effective execution and delivery of this Agreement as to the parties hereto and may be used for all purposes.  Signatures of the parties transmitted by facsimile or electronically shall be deemed their original signatures for all purposes.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

Exhibit A

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day, month and year set forth below.

"BUYER"

BURGESS GROUP CONSOLIDATED, LLC,
a North Carolina limited liability company

By: _____

Printed Name: _Vincent O. Burgess_

Title: _Member/Manager_

Dated: _19 November 2021_

"SELLER"

OMNISOURCE, LLC, an Indiana limited liability company

By: _____
G. Scott Gibble, Executive Vice President

Dated: _11 / 22 / 2021_

Exhibit A

<u>Exhibit A</u>

**Description of Real Estate**

*Lying and being located in the City of Wilmington, Cape Fear Township, New Hanover County, North Carolina and being more particularly described as follows:*

*Beginning at an existing iron rebar on the eastern right of way of US Highway 421, and being a corner with now or formerly Louisiana Pacific Corporation (Deed Book 1453, Page 840) thence along the right of way of US Highway 421 the following bearings and distances: N26°41'21"W 432.40 feet to an existing iron rebar; thence N20°27'21"W 336.12 feet to an existing iron rebar; thence N20°27'21"W 390.00 feet to an existing iron rebar; thence N21°22'21"W 48.38 feet to an existing iron rebar; thence leaving said right of way and along a line with now or formerly LH Griffin Family Ltd. Partnership (see Tract 2 in Plat Book 50, Page 141) thence with Griffin's line the following bearings and distances: N71°44'38"E 10.41 feet to an existing iron rebar; thence S85°55'12"E 49.32 feet to an existing iron rebar, thence along a curve to the left, having a radius of 433.29 feet, a tangent of 290.33 feet, an arc length of 516.73 feet, a delta angle of 65°18'33", and a chord bearing and distance of S53°14'12"E 488.80 feet to an existing iron rebar; thence N00°55'51"E 131.74 feet to an existing iron rebar; thence S30°04'04"E 57.43 feet to an existing iron rebar; thence N00°42'27"E 102.27 feet to an existing iron rebar; thence N88°44'38"W 33.73 feet to a point, said point being located in building (his point set); thence N00°43'52"E 131.99 feet to an existing iron rebar; thence N38°13'08"W 82.49 feet to an existing iron rebar; thence N00°32'54"E 873.84 feet to an existing iron rebar, said point being the northeast corner of Griffin property and a point in the line of now or formerly New Hanover County (Deed Book 1453, Page 32) thence with New Hanover County's line S53°43'02"E 813.03 feet to an existing concrete monument, a corner with now or formerly Boom Wright Partners, LTD. (Deed Book 2836, Page 854) thence with said line S53°43'02"E 1460.99 feet to an existing concrete monument, thence S83°45'02"E 39.02 feet to a point on the western bank of the Northeast Cape Fear River, said point is inaccessible and under water at the time of this survey); thence along the Low Water line as shown in Plat Book 50, Page 89 and Plat Book 50, Page 141 S03°35'07"W 1481.12 feet to a point on bank of Northeast Cape Fear River, (said point is inaccessible and under water at the line of this survey) thence leaving said bank N86°15'21"W 40.00 feet to an existing concrete monument, a point in the southern line of now or formerly Louisiana Pacific Corporation, thence with the line of Louisiana Pacific Corporation the following bearings and distances: N86°15'21"W 2058.07 feet to and existing iron rebar; thence S00°43'38"W 84.00 feet to an existing iron pipe; thence N86°15'21"W 42.36 feet to an existing iron pipe; thence S08°21'21"E 226.93 feet to the point and place of beginning and containing 80.32 Acres more or less and being all of Tract 1 as shown in Map Book 50, Page 89 and Plat Book 50, Page 141 of the Register of Deeds of New Hanover County, North Carolina.*

Also being described by the following Deed description:

Being all of TRACT 1, containing 80.32 acres, more or less, as shown on plat entitled "Recombination of Lots 1 and 2 Atlantic Scrap and Processing, LLC Division, Map Book 50, page 89", according to the plat thereof, recorded in Plat Book 50, Page 141, in the Office of the Register of Deeds of New Hanover County, North Carolina.

Exhibit A

**Exhibit B**

**Restrictive Covenants**

(see attached)

Exhibit A

## DECLARATION AND AGREEMENT OF RESTRICTIVE COVENANTS

This Declaration and Agreement of Restrictive Covenants ("Declaration") is made and entered into effective as of the _____ day of _____, 2021, by **OMNISOURCE LLC**, an Indiana limited liability company, successor by merger to OmniSource Southeast, LLC, a Delaware limited liability company (formerly known as Recycle South, LLC), successor by merger to Atlantic Scrap and Processing – Wilmington, LLC, a North Carolina limited liability company ("Declarant"):

### W I T N E S S E T H:

**WHEREAS,** Declarant is the owner in fee simple of certain real estate located in the New Hanover County, North Carolina, commonly known as 2830 U.S. Highway 421 N, Wilmington, North Carolina and legally described in Exhibit A attached hereto and made a part hereof (the "Real Estate");

**WHEREAS,** Declarant and **BURGESS GROUP CONSOLIDATED, LLC,** a North Carolina limited liability company ("Buyer") entered into a purchase agreement effective as of _____ ____, 2021 (the "Agreement"), wherein Declarant has agreed to sell and Buyer has agreed to purchase the Real Estate;

**WHEREAS,** as a condition to Declarant agreeing to enter into the Agreement and to sell the Real Estate under the Agreement, Declarant has insisted upon certain restrictions and covenants upon the Real Estate, and Buyer has agreed to permit such restrictions and covenants to be imposed on the Real Estate, prior to conveyance thereof by Declarant to Buyer. Declarant would not have agreed to sell the Real Estate in the absence of these restrictions and covenants by Declarant, and Declarant has materially relied upon such covenants and restrictions in agreeing to sell the Real Estate;

**NOW, THEREFORE,** in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Declarant hereby impresses upon the Real Estate and Buyer accepts the following restrictions and covenants which shall run with the Real Estate and be binding upon Declarant, Buyer, future owners of the Real Estate, and anyone claiming under them.

1. **Prohibited Uses of the Real Estate.** The Real Estate and any part thereof shall not be used, directly or indirectly, in any operation or business that involves, in whole or in part, the collection, storage, staging, transporting, recycling, transferring, processing, buying, selling or brokering of (a) loose or processed ferrous, or non-ferrous, or stainless scrap metals, (b) automobile parts and scrap, or (c) consumer and business electronic equipment and related parts and all other forms of e-waste (the "Restrictive Covenants"). Any conduct by the Buyer or any other person or entity on the Real Estate that violates the intent of this Declaration, as determined by Declarant in its sole and absolute discretion, shall be strictly prohibited and shall be a breach of this Declaration. Notwithstanding the foregoing, the Restrictive Covenants shall not apply to: (x) the storage, staging, transporting, transferring, buying, selling, distribution or brokering of new or functioning used automobile parts for the express purpose of wholesale or retail resale for

3061291.6

- 1 -

Exhibit A

automotive repair and not for scrap and not including any salvage yard or the presence of junk or inoperable vehicles (other than customer-owned vehicles temporarily stored for repair by an automotive repair business located on the Real Estate); or (y) the storage, staging, transporting, transferring, buying, selling, distribution or brokering of new or functioning used consumer or business electronic equipment, such as computer equipment, for reuse for its original manufactured purpose and not for scrap or e-waste.

    **2.  Duration and Alteration.**  The restrictions and covenants contained herein shall be construed as and shall be covenants running with the land and shall be binding upon all owners of all or any part of the Real Estate and any persons claiming under them, and shall continue in existence for a period of twenty-five (25) years commencing on the date of the recording hereof, and may be amended or abolished, in whole or in part, at any time prior to the expiration of said twenty-five (25) year period, only by the written agreement of Declarant.  The restrictions and covenants contained herein shall automatically terminate upon the expiration of the twenty-five (25) year period commencing on the date of the recording hereof without any further action or filings by the parties hereto.

    **3.  Investigation and Compliance.**  A representative of Declarant shall have the right of access to the Real Estate at all reasonable times and in a reasonable manner and upon reasonable notice to investigate and determine compliance with the provisions of this Declaration.

    **4.  No Waiver.**  The failure of Declarant to enforce the provisions of this Declaration shall not constitute a waiver of the right to enforce them on another occasion and no delay in enforcement shall constitute a waiver of the right of enforcement so long as a violation continues.

    **5.  Successors and Assigns.**  The restrictive covenants set forth above shall inure to the benefit of Declarant, its respective successors, grantees and assigns.

    **6.  Remedies.**  Declarant and Buyer acknowledge that it may be difficult to compensate Declarant with monetary damages in the event of a violation or breach of any restriction or covenant under this Declaration.  Declarant and Buyer therefore consent that in addition to any other right which Declarant may have at law or in equity as a result of an actual breach or violation, or threatened breach or violation, of any restriction or covenant under this Declaration temporary, preliminary and permanent injunctive relief may be granted in favor of Declarant, together with attorney's fees and costs, in any proceeding which may be brought to enforce any of the provisions of this Declaration, without the necessity of proof of actual damage.  Declarant's remedies shall be cumulative and non-exclusive and Declarant shall also be entitled to recover all actual, incidental, consequential, and punitive damages, together with attorney's fees and costs.

    **7.  Severability.**  Each covenant and restriction contained in any paragraph of this Declaration shall be severable and separate, and if any court should rule that any particular restriction or covenant is unenforceable, such ruling shall not affect the enforceability of any other restriction or covenant under this Declaration and such other restriction or covenant shall be enforced.

Exhibit A

**8.   Governing Law.**  This Declaration and the restrictions and covenants hereunder, shall be governed by the laws of the State of North Carolina.

[Remainder of page is intentionally left blank]

Exhibit A

**IN WITNESS WHEREOF**, Declarant and Buyer execute this Declaration by their duly authorized representatives, as of the date first written above.

**"Declarant"**

OMNISOURCE, LLC

By:_____
          G. Scott Gibble, Executive Vice President

STATE OF INDIANA      )
                            ) SS:
COUNTY OF ALLEN      )

On _____ ____, 2021, G. Scott Gibble, the Executive Vice President of OmniSource, LLC, appeared before me and acknowledged that he executed the foregoing instrument on behalf of the company.

My Commission Expires: _____

My County of Residence: _____

My Commission Number: _____

_____
Notary Public

_____
Printed Name

*[Signature page of Buyer follows]*

3061291.6

- 4 -

Exhibit A

**"Buyer"**

BURGESS GROUP CONSOLIDATED, LLC

By:_____

Name: _____

Its: _____

STATE OF _____     )
                             ) SS:
COUNTY OF _____     )

On _____ \_\_\_\_, 2021, _____ the_____ of Burgess Group Consolidated, LLC, appeared before me and acknowledged that he executed the foregoing instrument on behalf of the limited liability company.

My Commission Expires: _____

My County of Residence: _____

My Commission Number: _____

_____
Notary Public

_____
Printed Name

This instrument prepared by David R. Steiner, Attorney at Law, Barrett McNagny LLP, 215 East Berry Street, P.O. Box 2263, Fort Wayne, Indiana 46801-2263.

Exhibit A

**EXHIBIT A**

**Legal Description to Declaration and Agreement of Restrictive Covenants**

[TO COME]

## Exhibit C

**Shredder Moving Agreement**

(see attached)

Exhibit A

## SHREDDER MOVING AGREEMENT

THIS SHREDDER MOVING AGREEMENT ("Agreement") is entered into as of the ____ day of _____, 2021, by and between **OmniSource, LLC**, an Indiana limited liability company ("OmniSource") and **Burgess Corporation**, a North Carolina corporation ("Contractor"), under the following circumstances:

A.  OmniSource owns a metal shredder and ancillary shredder equipment (collectively, the "Shredder") located at real estate owned by OmniSource and commonly known as 2830 U.S. Highway 421 N, Wilmington, North Carolina (the "Real Estate").

B.  Contemporaneous with the execution of this Agreement, OmniSource is entering into a Real Estate Sale and Purchase Agreement ("Real Estate Purchase Agreement") with an affiliate of Contractor, Burgess Group Consolidated, LLC, a North Carolina limited liability Company ("Buyer") for the sale of the Real Estate to Buyer.

C.  As a condition to closing on the sale of the Real Estate pursuant to the Real Estate Purchase Agreement, OmniSource and Contractor must enter into this Agreement and Contractor must complete the disassembly and transportation of the Shredder as required by this Agreement.

NOW THEREFORE, in consideration of the foregoing and the mutual promises contained herein, the parties hereto agree as follows.

**1.**      **AGREEMENT**.  At its sole cost and expense, Contractor shall perform the scope of work attached hereto as <u>Exhibit A</u> (the "Scope of Work") and provide all necessary labor, equipment, machinery, materials, and transportation vehicles in connection therewith.  OmniSource shall cooperate to provide Contractor with access to the Real Estate and direction on such items and matters, and provide supervision and complete such tasks, as are required of OmniSource under the Scope of Work.

**2.**      **SCHEDULE.**  Within five (5) business days after the date of this Agreement, OmniSource and Contractor shall mutually agree on the commencement date of the Scope of Work at the Real Estate.  Contractor shall begin performance on such date and shall thereafter with commercially reasonable diligence complete the Scope of Work not later than two (2) business days prior to the closing on the sale of the Real Estate pursuant to the Real Estate Purchase Agreement.

**3.**      **TITLE AND OWNERSHIP.**  This is a contract for services only and the Contractor acquires no ownership, title, property rights, or interest in or to the Shredder or any part thereof.  Title to the Shredder shall at all times be and remain in the name of OmniSource, notwithstanding temporary possession thereof by Contractor in the course of its performance of the Scope of Work.

**4.**      **NO ASSIGNMENT BY CONTRACTOR**.  CONTRACTOR SHALL NOT ASSIGN OR IN ANY WAY DISPOSE OF ALL OR ANY PART OF ITS RIGHTS OR OBLIGATIONS UNDER THIS AGREEMENT WITHOUT THE PRIOR WRITTEN CONSENT OF OMNISOURCE, WHICH CONSENT MAY BE WITHHELD IN OMNISOURCE'S SOLE DISCRETION. No such

3101576.2

Exhibit A

assignment shall in any event release Contractor from its obligations under this Agreement, and Contractor shall remain primarily liable to OmniSource.

**5.    RISK OF LOSS.**  So long as the Shredder or any part thereof is in the possession of Contractor or an affiliate, subcontractor, agent or representative of Contractor, Contractor shall bear the entire risk of loss for theft, damage, destruction or other injury to the Shredder or such part thereof from any and every cause whatsoever.  Notwithstanding the foregoing, if, during the performance of this Agreement the Shredder or any part thereof is in the possession of OmniSource, at such times OmniSource shall bear the entire risk of loss for theft, damage, destruction or other injury to the Shredder or such part thereof from any and every cause except for any loss caused by Contractor's negligence, wrongful acts, misuse or breach of its obligations under this Agreement.

**6.    INSURANCE.**  Contractor shall obtain and maintain in effect until all performance under this Agreement is completed the following insurance:

(a)    Commercial general liability insurance with minimum limits of $2,000,000 per occurrence and $4,000,000 in the aggregate, covering personal injury, premises, operations independent contractors, products-completed operations and property damage arising out of or in connection with the services to be provided by Contractor pursuant to this Agreement. Such policy shall include contractual liability coverage as broad as ISO CG 00 01.  OmniSource shall be named as additional insured, and Contractor's policy shall be primary and non-contributory to the same coverage carried by OmniSource;

(b)    Workers compensation per statutory requirements with employers' liability insurance limits of at least $1,000,000 each accident, $1,000,000 for bodily injury by accident and $1,000,000 each employee for injury by disease;

(c)    Property insurance on an "All-risk" basis covering the full replacement cost value of all of OmniSource's property in Contractor's care, custody or control, including the Shredder and any part thereof, with such policy being endorsed to name OmniSource as "Loss Payee" as its interests may appear;

(d)    Commercial Automobile/Trucking Liability insurance coverage, specifically endorsed to cover the indemnity provisions between OmniSource and Contractor, with limits of liability not less than $2,000,000 per occurrence; and

(e)    All Risk Broad Form Motor Truck Cargo Legal Liability insurance in an amount not less than $500,000 per occurrence.  Such insurance policy shall provide coverage to OmniSource for any loss, damage or delay related to any property for transportation services provided by Contractor relating to the Shredder or any part thereof.  The coverage provided under this policy shall be primary and not contingent, and shall have no exclusions or restrictions of any type, including but not limited to any exclusion for the commodities being transported, unattended vehicles or limitation of coverage when the trailer is unattached to the power unit, or exclusions for rust or water damage, that would foreseeably preclude coverage for the tendered shipment.

Exhibit A

Each policy shall provide a waiver of subrogation in favor of the OmniSource. Umbrella and/or excess liability limits may be used to satisfy the underlying coverage limits. The terms and conditions of any umbrella and excess liability coverage must be no less restrictive than the underlying coverage. All insurance shall be provided by insurance carriers acceptable to OmniSource, having and maintaining at least an AM Best rating of "A-" and qualified in the state(s) in which the Shredder is located and to which it or any part thereof is transported. Compliance by the Contractor with the insurance requirements set forth herein shall not relieve Contractor from liability for amounts in excess of the minimum required limits of insurance. Contractor shall provide OmniSource with a certificate of insurance with applicable endorsements evidencing the insurance in a form acceptable to OmniSource. Contractor shall submit updated certificates of insurance and applicable endorsements prior to the expiration date of any insurance. The failure on the part of OmniSource to insist upon any requirements with respect to insurance shall not relieve Contractor of its obligations to fully comply with the insurance requirements set forth herein. Insurance policies shall be endorsed to give OmniSource advance written notice of the cancellation of any policy at least thirty (30) days prior to the effective date of such cancellation. If any portion of the work is subcontracted, Contractor shall require each subcontractor to maintain and furnish Contractor with satisfactory evidence that each subcontractor is maintaining the insurance noted above and such other forms and amounts of insurance as Contractor deems reasonably adequate.

7.    **INDEMNITY.**  Contractor shall indemnify and hold OmniSource harmless from and against all claims, losses, liabilities (including negligence, tort and strict liability), damages, judgments, suits, and all legal proceedings, and any and all costs and expenses in connection therewith (including attorneys' fees) arising out of or in any manner connected with its performance of the Scope of Work or with this Agreement, including, without limitation, (a) claims for injury to or death of persons and for damage to property, including, but not limited to, claims by employees of Contractor; and (b) claims relating to latent or other defects in the Shredder whether or not discoverable by OmniSource. Contractor agrees to give OmniSource prompt notice of any such claim or liability.

8.    **EXCLUSION OF CONSEQUENTIAL DAMAGES.**    NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, OMNISOURCE SHALL NOT, UNDER ANY CIRCUMSTANCES, BE LIABLE TO CONTRACTOR OR ANY THIRD PARTY FOR CONSEQUENTIAL, INCIDENTAL, SPECIAL OR EXEMPLARY DAMAGES ARISING OUT OF OR RELATED TO THE SHREDDER OR THE SCOPE OF WORK, WHETHER IN ACTION BASED ON CONTRACT, TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY) OR ANY OTHER LEGAL THEORY, INCLUDING, BUT NOT LIMITED TO, LOSS OF ANTICIPATED PROFITS, OR BENEFITS OF USE OR LOSS OF BUSINESS, EVEN IF OMNISOURCE IS APPRISED OF THE LIKELIHOOD OF SUCH DAMAGES OCCURRING.

IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT EACH AND EVERY PROVISION OF THIS AGREEMENT WHICH PROVIDES FOR A LIMITATION OF LIABILITY, DISCLAIMER OF WARRANTIES OR EXCLUSION OF DAMAGES, IS INTENDED BY THE PARTIES TO BE SEVERABLE FROM ANY OTHER PROVISION AND IS A SEPARABLE AND INDEPENDENT ELEMENT OF RISK ALLOCATION AND IS INTENDED TO BE ENFORCED AS SUCH.

Exhibit A

9.    **DEFAULT.**  An Event of Default shall occur hereunder if:

(a)    Contractor fails to commence or complete the Scope of Work on the schedule required by paragraph 2 of this Agreement; or

(b)    Contractor transports the Shredder or any part thereof to any location other than a location determined by OmniSource; or

(c)    Contractor fails to maintain the insurance as required by this Agreement; or

(d)    Contractor fails to perform or observe any other covenant, condition or agreement to be performed or observed by it hereunder, and such failure or breach shall continue unremedied for a period of three (3) days after Contractor becomes aware of such failure or breach; or

(e)    Contractor shall (i) be adjudicated insolvent or a bankrupt, or cease, be unable, or admit in writing its inability to pay its debts as they mature, or make a general assignment for the benefit of, or enter into any composition or arrangement with creditors; (ii) apply for or consent to the appointment of a receiver, trustee or liquidator of it or of a substantial part of its property, or authorize such application or consent, or proceedings seeking such appointment shall be instituted against it without such authorization, consent or application and shall continue undismissed for a period of forty-five (45) days; (iii) authorize or file a voluntary petition in bankruptcy or apply for or consent to the application of any bankruptcy, reorganization in bankruptcy, arrangement, readjustment of debt, insolvency, dissolution, moratorium or other similar law of any jurisdiction, or authorize such application or consent; or proceedings to such end shall be instituted against it without such authorization, application or consent and such proceeding instituted against it shall continue undismissed for a period of forty-five (45) days.

10.    **REMEDIES.**  Upon the occurrence of any Event of Default and at any time thereafter, OmniSource may, with or without cancelling this Agreement, in its sole discretion, do any one or more of the following:

(a)    Upon written notice to Contractor cancel this Agreement;

(b)    Upon written notice to Contractor, remove Contractor from the Real Estate and any other OmniSource location and repossess the Shredder or any part thereof wherever found, with or without legal process and without liability for suit, action or other proceeding by Contractor (any damages occasioned by such repossession being hereby expressly waived by Contractor);

(c)    Satisfy any damages sustained by OmniSource arising from Contractor's Event of Default by payment from the Earnest Money deposited by Buyer and held by the Title Company pursuant to the Real Estate Purchase Agreement, upon demand made by

Exhibit A

OmniSource to the Title Company (as the terms "Earnest Money" and "Title Company" are defined in the Real Estate Purchase Agreement).

(d)    Exercise any other right or remedy which may be available to it under applicable law; and

(e)    A cancellation hereunder shall occur only upon notice by OmniSource and only as to such parts of the Shredder as OmniSource specifically elects to cancel and this Agreement shall continue in full force and effect as to the remaining items, if any.

No remedy referred to in this paragraph is intended to be exclusive but shall be cumulative and in addition to any other remedy referred to above or otherwise available to OmniSource at law or in equity. No express or implied waiver by OmniSource of any default shall constitute a waiver of any other default by Contractor or a waiver of any of OmniSource's rights.

**11.    BINDING EFFECT.** This Agreement shall inure to the benefit of, and be enforceable against, the parties and their respective successors and assigns. OmniSource and Contractor intend this Agreement to be a valid and binding legal instrument and agree that no provision of this Agreement which may be deemed unenforceable shall in any way invalidate any other provision or provisions of this Agreement, all of which shall remain in full force and effect.

**12.    WAIVER OF JURY TRIAL.** THE PARTIES HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. EITHER PARTY MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT AMONG THE PARTIES IRREVOCABLY TO WAIVE TRIAL BY JURY, AND ANY PROCEEDING WHATSOEVER BETWEEN THEM RELATING TO THIS AGREEMENT SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

**13.    GOVERNING LAW: JURISDICTION; VENUE; SERVICE OF PROCESS.** THIS AGREEMENT SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF INDIANA, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE. CONTRACTOR HEREBY CONSENTS TO THE JURISDICTION AND VENUE OF THE COURTS OF ALLEN COUNTY, STATE OF INDIANA WITH RESPECT TO ANY ACTION COMMENCED HEREUNDER AND AGREES THAT ANY ACTION INITIATED BY CONTRACTOR MUST BE BROUGHT IN SAID COURT. NOTHING CONTAINED HEREIN, HOWEVER, IS INTENDED TO PRECLUDE OMNISOURCE FROM COMMENCING ANY ACTION HEREUNDER IN ANY COURT HAVING JURISDICTION THEREOF. CONTRACTOR AGREES THAT SERVICE OF PROCESS IN ANY ACTION SHALL BE SUFFICIENT IF MADE BY FIRST-CLASS CERTIFIED MAIL, RETURN-RECEIPT REQUESTED TO THE ADDRESS OF CONTRACTOR SET FORTH IN THIS AGREEMENT.

*[Signature page follows]*

Exhibit A

IN WITNESS WHEREOF, the parties hereto have executed this Shredder Moving Agreement on the day, month and year set forth below.

**OMNISOURCE, LLC**

By: _____
          G. Scott Gibble, Executive Vice President

**BURGESS CORPORATION**

By: _____

_____
       (Printed Name and Title)

Address:

_____

_____

_____

6

Exhibit A

## Exhibit A

### Scope of Work

(see attached)

Exhibit A



Wilmington Shredder Disassemble and Transportation to Storage

2830 US Highway 421 N

Wilmington, NC 28401

<u>Scope of Work</u>

Contractor to disassemble and transport all of the following equipment and components:

- Infeed conveyor & assembly drive chain and support structure
- Feed chute, Dual Feed Rollers (DFR) and support structure
- Shredder (aka Mill) Rotor installed in base section
- Shredder bonnet, mid-section, and base section
- Shredder liner package can be dropped out of mid and base section for weight reduction
- Spare Shredder Rotor
- Shredder base support structure and spring boxes
- Under Mill Oscillating (UMO) Conveyor
- Downstream conveyors, Magnet stand(s), cyclone, "z" box and picking house
- Shredder motor and drive shaft
- Motor Control Center in Shredder Motor Building
- Miscellaneous Control Panels in Shredder Motor Building
- Hydraulic units in Shredder Motor Building
- Rectifiers in Shredder Motor Building
- Motor starter in Shredder Motor Building
- Spare parts and castings stored on site
- All ancillary equipment identified by OmniSource pertaining to the shredder

The items above comprise the Shredder and its ancillary equipment.

Exhibit A

Contractor to transport all items to OmniSource location(s) within 300 miles of this site, with location(s) to be determined by OmniSource at time of disassembly.

Contractor to provide all disassembly, rigging, loading and transportation under OmniSource supervision.  OmniSource will be responsible for off-loading at the designated OmniSource location(s). Off-loading is to be coordinated between Contractor and OmniSource.

OmniSource will turn off in the substation the electricity to the shredder building.  Contractor to then cut and abandon all conduits and wires supplying power to the shredder motor and any ancillary equipment.

Contractor to drain hydraulic systems and properly dispose of drained fluids.  Contractor to cut and abandon all remaining piping.

The following items are not included in this Scope of Work and are to remain on site:

- All Buildings
- Structures
- Substation and pad mount transformers
- Concrete bin walls
- Fire pump house
- Water storage tank
- Truck Scale
- Colonial Materials building and related structures (existing tenant)

Contractor must comply with all OmniSource safety requirements.

Exhibit A

## <u>FIRST AMENDMENT TO REAL ESTATE SALE AND PURCHASE AGREEMENT</u>

THIS FIRST AMENDMENT TO REAL ESTATE SALE AND PURCHASE AGREEMENT (this "Amendment") is made and entered into effective January 18, 2022, by and between OMNISOURCE, LLC, an Indiana limited liability company, successor by merger to OmniSource Southeast, LLC, a Delaware limited liability company (formerly known as Recycle South, LLC), successor by merger to Atlantic Scrap and Processing – Wilmington, LLC, a North Carolina limited liability company ("Seller"), and BURGESS GROUP CONSOLIDATED, LLC, a North Carolina limited liability company ("Buyer"), under the following circumstances:

A.    Seller and Buyer entered into a Real Estate Sale and Purchase Agreement dated November 22, 2021 ("Agreement").

B.    Buyer has requested additional time to obtain the Survey.

C.    The parties desire to amend the Agreement to extend the time period for Buyer to obtain the Survey and to correspondingly shorten the time period between the end of the Title Cure Period and the Closing.

NOW, THEREFORE, in mutual consideration of the promises contained herein, the parties agree as follows:

1.    The first sentence of Section 6(b) of the Agreement is deleted and replaced with the following:

Buyer may order an ALTA survey of the Real Estate ("Survey") within ten (10) business days after the Effective Date and obtain the same by no later than February 1, 2022.

2.    Section 12(a) of the Agreement is deleted and replaced with the following:

(a)    <u>Closing Date</u>. Provided this Agreement has not been terminated as allowed herein and all conditions set forth in Section 10 hereof or elsewhere herein have been satisfied or waived, the Closing shall take place on or before seventy (70) business days after the end of the Title Cure Period, or on an earlier date not less than ten (10) business days after Buyer sends to Seller written notice that Buyer is ready, willing and able to close. Unless agreed otherwise, Seller and Buyer shall conduct an escrow-style closing through the Title Company in order that it will not be necessary for either party to physically attend Closing (Seller and Buyer shall work with each other in good faith to finalize and sign all documents not later than the day prior to Closing and deliver such items to the Title Company).

3.    <u>Definitions</u>.    Capitalized terms not otherwise defined herein shall have the meaning given to them in the Agreement.

3192964.1

- 1 -

Exhibit B

4.    <u>Counterparts; Execution</u>.  This Amendment may be executed in one or more counterparts, all of which shall be considered one and the same amendment, and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party.  The exchange of copies of this Amendment and of signature pages by facsimile or electronic transmission shall constitute effective execution and delivery of this Amendment as to the parties and may be used for all purposes.  Signatures of the parties transmitted by facsimile or electronically shall be deemed their original signatures for all purposes.

5.    The Agreement, as amended herein, remains in full force and effect.

[SIGNATURE PAGE FOLLOWS]

Exhibit B

IN WITNESS WHEREOF, the parties hereto have executed this Amendment on the day, month and year set forth below.

"BUYER"

BURGESS GROUP CONSOLIDATED, LLC,
a North Carolina limited liability company

By: _____

Printed Name: Vincent O. Burgess

Title: Member / Manager

"SELLER"

OMNISOURCE, LLC, an Indiana limited liability company

By: _____
G. Scott Gibble, Executive Vice President

3192964.1

- 3 -

Exhibit B

## SECOND AMENDMENT TO REAL ESTATE SALE AND PURCHASE AGREEMENT

THIS SECOND AMENDMENT TO REAL ESTATE SALE AND PURCHASE AGREEMENT (this "Amendment") is made and entered into effective June _15_, 2022, by and between OMNISOURCE, LLC, an Indiana limited liability company, successor by merger to OmniSource Southeast, LLC, a Delaware limited liability company (formerly known as Recycle South, LLC), successor by merger to Atlantic Scrap and Processing – Wilmington, LLC, a North Carolina limited liability company ("Seller"), and BURGESS GROUP CONSOLIDATED, LLC, a North Carolina limited liability company ("Buyer"), under the following circumstances:

A.  Seller and Buyer entered into a Real Estate Sale and Purchase Agreement dated November 22, 2021, as amended by a First Amendment to Real Estate Sale and Purchase Agreement dated January 18, 2022 (collectively, the "Agreement").

B.  In connection with the Agreement, Seller and Buyer's affiliate, Burgess Corporation ("Buyer's Affiliate") entered into a Shredder Moving Agreement dated November 22, 2022 ("Shredder Agreement") wherein Buyer's Affiliate has agreed to disassemble and transport Seller's metal shredder and ancillary shredder equipment (collectively, the "Shredder") from the Real Estate at Buyer's Affiliate's sole cost and expense prior to closing on the sale and purchase of the Real Estate and as a condition of Buyer's and Seller's obligations to close on the purchase and sale of the Real Estate.

C.  Notwithstanding Section 5 of the Agreement in which Buyer expressly waives any right to terminate the Agreement based upon any condition of the Property and Section 8 of the Agreement in which Buyer has agreed to purchase the Property "as is – where is, with all faults", Buyer has requested that Seller contribute to the cost of repairing the existing fire suppression system in the buildings on the Real Estate.

D.  The parties desire to amend the Agreement to amend the definition of Personal Property under the Agreement, to resolve Buyer's request regarding the fire suppression system.

NOW, THEREFORE, in mutual consideration of the promises contained herein, the parties agree as follows:

1.  <u>Sidetrack</u>. The term "Personal Property" as defined in the Agreement shall be amended to include the track structure (rail, ties, and fastenings), ballast, grading, drainage structure, turnout, bumping post and other appurtenances (collectively, the "Sidetrack") owned by Seller and located on the Real Estate.

2.  <u>Credit at Closing</u>. Buyer shall receive a credit at Closing against the Purchase Price in the amount of Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00), and in consideration of the same and the assignment by Seller to Buyer of the Sidetrack Claim per paragraph 3 below, Buyer:

Exhibit C

(a)    Waives and releases any claim or demand against Seller or Seller Affiliated Parties with respect to the fire suppression system and any other condition of the Property that Buyer has raised or may raise subsequent to the date of the Agreement, including without limitation the condition of the Sidetrack or rail access to the Real Estate or the condition of the buildings or utilities on the Real Estate (including, without limitation the revocation or lack of certificates of occupancy for any buildings or compliance with building codes), and Buyer hereby reaffirms the provisions of Sections 5 and 8 of the Agreement;

(b)    At Closing on the purchase of the Real Estate, shall waive, release, indemnify, defend, and hold harmless Seller and Seller Affiliated Parties from and against any claim or demand brought or asserted by Tenant after the date hereof related to the fire suppression system or for any breach or default of the Existing Lease or for any other reason related to Tenant's presence on the Real Estate (the "Tenant Claim Indemnification");

(c)    Shall accept at Closing an Existing Lease Assignment in a form that (i) allows Seller to disclaim any representation or certification as to there being no default under the Existing Lease with respect to the fire suppression system or Seller's obligation to repair or maintain the same or compliance with building codes with respect to the same, (ii) contains the Tenant Claim Indemnification, and (iii) does not contain an acknowledgment by Tenant of the assignment of the Existing Lease, or confirmation by Tenant that there are no defaults under the Existing Lease;

(d)    Shall cause Buyer's Affiliate to continue, now and after Closing on the sale and purchase of the Real Estate as provided in paragraph 3 below, to actively disassemble the Shredder on the Real Estate and to remove the Shredder completely from the Real Estate and transport the same to locations determined by Seller as required by the Shredder Moving Agreement; if Buyer's Affiliate shall fail to do so, Buyer's Affiliate shall be deemed to be in default under the Shredder Agreement, and Seller may exercise any one or more of its remedies available under the Shredder Agreement.

3.    <u>Closing</u>.    At Closing, Buyer shall pay the amount of Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00) into an escrow to be held by the Title Company pursuant to an escrow agreement reasonably acceptable to Seller, Buyer and the Title Company as security for the performance of Buyer's Affiliate under the Shredder Agreement (the "Shredder Escrow"), with any fees of the Title Company for serving as escrow agent to be deducted from the Shredder Escrow. In consideration of the foregoing, Buyer and Seller agree to waive their respective conditions set forth in Sections 10(a)(ii) and 10(b)(ii) of the Agreement with respect to the Shredder having been moved prior to Closing and shall nevertheless in good

Exhibit C

faith work to complete the Closing on or about June 16, 2022 or as soon thereafter as reasonably practicable. The parties acknowledge that the Shredder Agreement is being amended by Seller and Buyer's Affiliate consistent and contemporaneous with this Amendment and, as amended thereby, shall remain in full force and effect after the Closing until Buyer's Affiliate has completed the Scope of Work set forth in the Shredder Agreement.

      4.    <u>Sidetrack Agreement</u>. Seller and CSX Transportation, Inc. ("CSX") are parties to a Private Sidetrack Agreement dated June 18, 2007, relating to the Sidetrack (the "Sidetrack Agreement"), which may be terminated by either party thereto upon thirty (30) days' notice to the other party. Seller intends to terminate the Sidetrack Agreement by providing such notice to CSX on or before Closing on the sale of the Real Estate to Buyer; however, Seller shall not in any way compromise the Sidetrack Claim in connection with termination of the Sidetrack Agreement or otherwise. For the avoidance of doubt, the parties agree that Seller's notice to terminate the Sidetrack Agreement provided to CSX shall not constitute a compromise in any way of the Sidetrack Claim. To the extent desired by Buyer, it shall be Buyer's sole and exclusive obligation and cost to negotiate and enter into its own sidetrack agreement with CSX. Seller agrees to assign at Closing, without representation or warranty, any claim it may have against CSX related to the unauthorized removal or replacement of any part of the Sidetrack by CSX (the "Sidetrack Claim"), the form of such assignment to be reasonably satisfactory to Buyer and Seller. At Buyer's sole cost and expense, Seller shall take such other and further reasonable actions as Buyer deems reasonably necessary to effectuate the assignment, and preserve the validity, of the Sidetrack Claim.

      5.    <u>Definitions</u>. Capitalized terms not otherwise defined herein shall have the meaning given to them in the Agreement.

      6.    <u>Counterparts; Execution</u>. This Amendment may be executed in one or more counterparts, all of which shall be considered one and the same amendment, and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party. The exchange of copies of this Amendment and of signature pages by facsimile or electronic transmission shall constitute effective execution and delivery of this Amendment as to the parties and may be used for all purposes. Signatures of the parties transmitted by facsimile or electronically shall be deemed their original signatures for all purposes.

      7.    The Agreement, as amended herein, remains in full force and effect.

[SIGNATURE PAGE FOLLOWS]

Exhibit C

IN WITNESS WHEREOF, the parties hereto have executed this Amendment on the day, month and year set forth below.

"BUYER"

BURGESS GROUP CONSOLIDATED, LLC,
a North Carolina limited liability company

By: _____
Vincent O. Burgess, Member/Manager

"SELLER"

OMNISOURCE, LLC, an Indiana limited liability company

By: _____
G. Scott Gibble, Executive Vice President

Acknowledged and agreed to with respect to paragraph 1(d) and paragraph 3 of the foregoing Amendment.

BURGESS CORPORATION

By: _____
Vincent O. Burgess, President

3264762.9                                  - 4 -

Exhibit C

| BK: RB 6573 | | |
| --- | --- | --- |
| PG: 2709 - 2715 | | NC FEE $26.00 |
| RECORDED: | 2022022957 | |
| 06/17/2022 | NEW HANOVER COUNTY, | REAL ESTATE |
| 01:01:31 PM | TAMMY THEUSCH PIVER | EXTX $9000.00 |
| BY: ANDREA CRESWELL | REGISTER OF DEEDS | |
| ASSISTANT | | |

ELECTRONICALLY RECORDED

# NORTH CAROLINA SPECIAL WARRANTY DEED

Excise Tax: $9,000.00            Parcel Identification Number (PIN): R04000-003-013-000

Mail after recording to:     **Murchison, Taylor & Gibson, PLLC (DGM)**
                             **1979 Eastwood Road, Suite 101, Wilmington, NC 28403**

This instrument was prepared by:     **David R. Steiner, Barrett McNagny LLP**
                                     **215 East Berry Street, Fort Wayne, IN 46802**

| GRANTOR | GRANTEE |
| --- | --- |
| OMNISOURCE, LLC, an Indiana limited liability company, successor by merger to OmniSource Southeast, LLC, a Delaware limited liability company (formerly known as Recycle South, LLC), successor by merger to Atlantic Scrap and Processing – Wilmington, LLC, a North Carolina limited liability company | BURGESS GROUP CONSOLIDATED, LLC, a North Carolina limited liability company |
| Mailing Address: 7575 W. Jefferson Blvd. Fort Wayne, IN 46804 | Mailing Address: 605 Warsaw Road Clinton, NC 28328 |

THIS DEED is made this 16th day of June, 2022 by **OMNISOURCE, LLC**, an Indiana limited liability company, as successor by merger to OmniSource Southeast, LLC (formerly known as Recycle South, LLC), successor by merger to Atlantic Scrap and Processing – Wilmington, LLC ("Grantor"), to **BURGESS GROUP CONSOLIDATED, LLC**, a North Carolina limited liability company ("Grantee"). The designation Grantor and Grantee as used herein shall include said parties, their heirs,

Submitted electronically by "Chicago Title Company, LLC"
in compliance with North Carolina statutes governing recordable documents
and the terms of the submitter agreement with the New Hanover County Register of Deeds.

Exhibit D

successors and assigns, and shall include singular, plural, masculine, feminine or neuter as require by context.

WITNESSETH, that Grantor, for a valuable consideration paid by the Grantee, the receipt of which is hereby acknowledged, has and by these presents does grant, bargain, sell and convey unto Grantee in fee simple, all that certain lot or parcel of land situated in New Hanover County, North Carolina and more particularly described as follows:

See **Exhibit A** attached hereto and incorporated herein by reference.

In compliance with NCGS Section 105-317.2, the property conveyed does not include the primary residence of Grantor.

The property hereinabove described is a portion of the same property acquired by Grantor by instrument recorded in Book 4685 at Page 192 in the Office of the Register of Deeds for New Hanover County.

TO HAVE AND TO HOLD the aforesaid lot or parcel of land and all privileges and appurtenances thereto belonging to the Grantee in fee simple.

TOGETHER WITH: (i) all buildings and improvements located on the aforesaid lot or parcel of land, (ii) all fixtures affixed to all such buildings and improvements, (iii) all easements, rights of way, privileges, licenses, hereditaments, appurtenances and all other rights and benefits appurtenant or in any way related to, and/or demised under any lease of or other context or agreement for the use of the aforesaid land, and (iv) all strips and gores and any land lying in the bed of a public road, highway or other access way, open or proposed adjoining the aforesaid land.

AND THE GRANTOR covenants with the Grantee, that the Grantor has done nothing to impair such title as Grantor received, and Grantor will warrant and defend the title against the lawful claims of all persons claiming by, under or through Grantor, except for the exceptions hereinafter stated.

Title to the property hereinabove described is subject to the exceptions set forth on **Exhibit B** attached hereto and incorporated herein by reference.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

Exhibit D

**IN WITNESS WHEREOF**, the Grantor has hereunto caused this instrument to be executed by authority duly given as of the day and year first above written.

OMNISOURCE, LLC
an Indiana limited liability company

By: _____
G. Scott Gibble, Executive Vice President

STATE OF INDIANA  )
                  ) SS:
COUNTY OF ALLEN  )

Before me, a Notary Public in and for said County and State, this 14 day of June 2022, personally appeared G. Scott Gibble, the Executive Vice President of OmniSource, LLC, who acknowledged execution of the foregoing Special Warranty Deed, as and for the voluntary act and deed of the company.

My Commission Expires: Feb 17, 2029

My County of Residence: Allen

My Commission Number: NP0731783

Shannon Spangler
Notary Public Signature

Shannon Spangler
Notary Public Printed Name

SHANNON SPANGLER
Notary Public - Seal
Allen County - State of Indiana
Commission Number NP0731783
My Commission Expires Feb 17, 2029

Exhibit D

## EXHIBIT A

Legal Description

BEING all of Tract 1, containing 80.32 acres as shown on a plat entitled "Recombination of Lots 1 and 2 Atlantic Scrap and Processing, LLC Division, Map Book 50, page 89", according to the plat thereof recorded in Map Book 50, page 141 in the Office of the Register of Deeds of New Hanover County, North Carolina.

Exhibit D

## EXHIBIT B

Permitted Exceptions

1. Taxes or assessments for the year 2022, and subsequent years, not yet due or payable.

2. Any right, easement, setback, interest, claim, encroachment, encumbrance, violation, variation, or other adverse circumstance affecting the Title disclosed by survey entitled "ALTA/NSPS Land Title Survey For 2830 Highway 421 Owner, LLC" by Jimmy C. Barbour, P.L.S. of Jimmy Barbour Surveying, PA, dated May 23, 2022 (Date of Plat January 18, 2022) (the "Survey").

3. The correctness of the square footage/acreage computation contained in the description of the Land is not insured.

4. Any right, easement, setback, interest, claim, encroachment, encumbrance, violation, variations or other adverse circumstance affecting the Title disclosed by plats recorded in Map Book 50, page 89 and Map Book 50, page 141, and as shown on the Survey.

5. Covenants, conditions, restrictions, easements, liens, reservation (or grant) of oil, gas, and other mineral rights provided for in instrument(s) filed for record in Book 707, page 584; Book 720, page 250; Book 721, page 74; Book 722, page 141; Book 723, page 49; Book 723, page 50; Book 752, page 595; Book 763, page 331; Book 874, page 521; Book 1176, page 1599; Book 1176, page 1606; Book 1241, page 199; Book 1241, page 215; Book 1413, page 1081; and Book 4685, page 192, some matters of which are shown on the Survey, and any related maps, plans, bylaws and other document(s) and amendment(s), but omitting any covenants or restrictions, if any, based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, ancestry, or source of income, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law.

6. Easement Deed recorded in Book 751, page 265, and as shown on the Survey.

7. Easement(s) to Carolina Power & Light Company recorded in Book 1009, page 511 and Book 5073, page 1342, and as shown on the Survey.

8. Easement to Carolina Power & Light Company d/b/a Progress Energy Carolinas, Inc. recorded in Book 5150, page 2290, and as shown on the Survey.

9. Agreement by and between Carolina Nitrogen Corporation and Carolina Power and Light Company recorded in Book 722, page 2 as shown on the Survey.

10. Agreement by and between Carolina Nitrogen Corporation and North Carolina Natural Gas Corporation recorded in Book 721, page 275 as shown on the Survey.

11. Easement to Seacor, Inc. recorded in Book 1181, page 374 as shown on the Survey.

Exhibit D

12. General Utility Easement to the City of Wilmington recorded in Book 1244, page 1036, and as shown on the Survey.

13. Easement(s) and Right(s) of Way set forth in Deed recorded in Book 808, page 366, and as shown on the Survey.

14. Declaration of Final Resolution of Claim to Submerged Lands recorded in Book 1963, page 623 and Book 1963, page 625, as shown on the Survey.

15. Agreement by and between Swift & Company and Carolina Power & Light Company recorded in Book 596, page 142, and as shown on the Survey.

16. Agreement by and between Swift & Company and Tide Water Power Company recorded in Book 314, page 440.

17. Agreement by and between Swift & Company and North Carolina Natural Gas Corp. recorded in Book 690, page 245.

18. Agreement by and between Seaboard Air Line Railway and Atlantic Coast Line Railroad Co. recorded in Book 82, page 354, as affected by Supplemental Agreement by and between Seaboard Air Line Railroad Company and Swift & Company recorded in Book 563, page 185.

19. General Permit to Southern Bell and Telegraph Company recorded in Book 303, page 600.

20. Easement Agreement recorded in Book 5114, page 1076, and as shown on the Survey.

21. Agreement by and between Swift & Company and North Carolina Natural Gas Corporation recorded in Book 660, page 116, and as shown on the Survey.

22. Right(s) of Way to Swift & Company recorded in Book 593, page 189, and as shown on the Survey.

23. Grant of Easement Transmission to Piedmont Natural Gas Company, Inc. recorded in Book 5718, page 100, and as shown on the Survey.

24. Deed of Easement recorded in Book 6072, page 778, and as shown on the Survey.

25. Declaration and Agreement of Restrictive Covenants recorded in Book 6573, page 2611.

26. Riparian and/or littoral rights incident to the Land; rights of others in and to the continuous and uninterrupted flow of the waters bounding or crossing the Land; and title to any portion of the Land owned by any governmental entity including, but not limited to, marsh, dredged and/or filled areas and Land below the mean high-water mark, and as shown on the Survey.

Exhibit D

27. Title to that portion of the Land, if any, lying within the railroad right of way extending up to one hundred feet (100') on each side of the tracks or two hundred feet (200') in total width, whichever is greater and rights of way for railroad, switch tracks, spur tracks, railway facilities, easements, and other related interests, if any, on and across the Land, and as shown on the Survey.

28. Lease by and between OmniSource Southeast, LLC and Colonial Materials of Fayetteville, Inc., a memorandum of which is recorded in Book 6125, page 2092

Exhibit D

## SHREDDER MOVING AGREEMENT

THIS SHREDDER MOVING AGREEMENT ("Agreement") is entered into as of the 22ND day of November, 2021, by and between **OmniSource, LLC**, an Indiana limited liability company ("OmniSource") and **Burgess Corporation**, a North Carolina corporation ("Contractor"), under the following circumstances:

   A. OmniSource owns a metal shredder and ancillary shredder equipment (collectively, the "Shredder") located at real estate owned by OmniSource and commonly known as 2830 U.S. Highway 421 N, Wilmington, North Carolina (the "Real Estate").

   B. Contemporaneous with the execution of this Agreement, OmniSource is entering into a Real Estate Sale and Purchase Agreement ("Real Estate Purchase Agreement") with an affiliate of Contractor, Burgess Group Consolidated, LLC, a North Carolina limited liability Company ("Buyer") for the sale of the Real Estate to Buyer.

   C. As a condition to closing on the sale of the Real Estate pursuant to the Real Estate Purchase Agreement, OmniSource and Contractor must enter into this Agreement and Contractor must complete the disassembly and transportation of the Shredder as required by this Agreement.

NOW THEREFORE, in consideration of the foregoing and the mutual promises contained herein, the parties hereto agree as follows.

1.    **AGREEMENT**.  At its sole cost and expense, Contractor shall perform the scope of work attached hereto as <u>Exhibit A</u> (the "Scope of Work") and provide all necessary labor, equipment, machinery, materials, and transportation vehicles in connection therewith.  OmniSource shall cooperate to provide Contractor with access to the Real Estate and direction on such items and matters, and provide supervision and complete such tasks, as are required of OmniSource under the Scope of Work.

2.    **SCHEDULE.**  Within five (5) business days after the date of this Agreement, OmniSource and Contractor shall mutually agree on the commencement date of the Scope of Work at the Real Estate.  Contractor shall begin performance on such date and shall thereafter with commercially reasonable diligence complete the Scope of Work not later than two (2) business days prior to the closing on the sale of the Real Estate pursuant to the Real Estate Purchase Agreement.

3.    **TITLE AND OWNERSHIP.**  This is a contract for services only and the Contractor acquires no ownership, title, property rights, or interest in or to the Shredder or any part thereof.  Title to the Shredder shall at all times be and remain in the name of OmniSource, notwithstanding temporary possession thereof by Contractor in the course of its performance of the Scope of Work.

4.    **NO ASSIGNMENT BY CONTRACTOR**.  CONTRACTOR SHALL NOT ASSIGN OR IN ANY WAY DISPOSE OF ALL OR ANY PART OF ITS RIGHTS OR OBLIGATIONS UNDER THIS AGREEMENT WITHOUT THE PRIOR WRITTEN CONSENT OF OMNISOURCE, WHICH CONSENT MAY BE WITHHELD IN OMNISOURCE'S SOLE DISCRETION.  No such

3101576.2

Exhibit E

assignment shall in any event release Contractor from its obligations under this Agreement, and Contractor shall remain primarily liable to OmniSource.

**5.    RISK OF LOSS.** So long as the Shredder or any part thereof is in the possession of Contractor or an affiliate, subcontractor, agent or representative of Contractor, Contractor shall bear the entire risk of loss for theft, damage, destruction or other injury to the Shredder or such part thereof from any and every cause whatsoever. Notwithstanding the foregoing, if, during the performance of this Agreement the Shredder or any part thereof is in the possession of OmniSource, at such times OmniSource shall bear the entire risk of loss for theft, damage, destruction or other injury to the Shredder or such part thereof from any and every cause except for any loss caused by Contractor's negligence, wrongful acts, misuse or breach of its obligations under this Agreement.

**6.    INSURANCE.** Contractor shall obtain and maintain in effect until all performance under this Agreement is completed the following insurance:

  (a)    Commercial general liability insurance with minimum limits of $2,000,000 per occurrence and $4,000,000 in the aggregate, covering personal injury, premises, operations independent contractors, products-completed operations and property damage arising out of or in connection with the services to be provided by Contractor pursuant to this Agreement. Such policy shall include contractual liability coverage as broad as ISO CG 00 01. OmniSource shall be named as additional insured, and Contractor's policy shall be primary and non-contributory to the same coverage carried by OmniSource;

  (b)    Workers compensation per statutory requirements with employers' liability insurance limits of at least $1,000,000 each accident, $1,000,000 for bodily injury by accident and $1,000,000 each employee for injury by disease;

  (c)    Property insurance on an "All-risk" basis covering the full replacement cost value of all of OmniSource's property in Contractor's care, custody or control, including the Shredder and any part thereof, with such policy being endorsed to name OmniSource as "Loss Payee" as its interests may appear;

  (d)    Commercial Automobile/Trucking Liability insurance coverage, specifically endorsed to cover the indemnity provisions between OmniSource and Contractor, with limits of liability not less than $2,000,000 per occurrence; and

  (e)    All Risk Broad Form Motor Truck Cargo Legal Liability insurance in an amount not less than $500,000 per occurrence. Such insurance policy shall provide coverage to OmniSource for any loss, damage or delay related to any property for transportation services provided by Contractor relating to the Shredder or any part thereof. The coverage provided under this policy shall be primary and not contingent, and shall have no exclusions or restrictions of any type, including but not limited to any exclusion for the commodities being transported, unattended vehicles or limitation of coverage when the trailer is unattached to the power unit, or exclusions for rust or water damage, that would foreseeably preclude coverage for the tendered shipment.

Exhibit E

Each policy shall provide a waiver of subrogation in favor of the OmniSource. Umbrella and/or excess liability limits may be used to satisfy the underlying coverage limits. The terms and conditions of any umbrella and excess liability coverage must be no less restrictive than the underlying coverage. All insurance shall be provided by insurance carriers acceptable to OmniSource, having and maintaining at least an AM Best rating of "A-" and qualified in the state(s) in which the Shredder is located and to which it or any part thereof is transported. Compliance by the Contractor with the insurance requirements set forth herein shall not relieve Contractor from liability for amounts in excess of the minimum required limits of insurance. Contractor shall provide OmniSource with a certificate of insurance with applicable endorsements evidencing the insurance in a form acceptable to OmniSource. Contractor shall submit updated certificates of insurance and applicable endorsements prior to the expiration date of any insurance. The failure on the part of OmniSource to insist upon any requirements with respect to insurance shall not relieve Contractor of its obligations to fully comply with the insurance requirements set forth herein. Insurance policies shall be endorsed to give OmniSource advance written notice of the cancellation of any policy at least thirty (30) days prior to the effective date of such cancellation. If any portion of the work is subcontracted, Contractor shall require each subcontractor to maintain and furnish Contractor with satisfactory evidence that each subcontractor is maintaining the insurance noted above and such other forms and amounts of insurance as Contractor deems reasonably adequate.

7.     **INDEMNITY.** Contractor shall indemnify and hold OmniSource harmless from and against all claims, losses, liabilities (including negligence, tort and strict liability), damages, judgments, suits, and all legal proceedings, and any and all costs and expenses in connection therewith (including attorneys' fees) arising out of or in any manner connected with its performance of the Scope of Work or with this Agreement, including, without limitation, (a) claims for injury to or death of persons and for damage to property, including, but not limited to, claims by employees of Contractor; and (b) claims relating to latent or other defects in the Shredder whether or not discoverable by OmniSource. Contractor agrees to give OmniSource prompt notice of any such claim or liability.

8.     **EXCLUSION OF CONSEQUENTIAL DAMAGES.** NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, OMNISOURCE SHALL NOT, UNDER ANY CIRCUMSTANCES, BE LIABLE TO CONTRACTOR OR ANY THIRD PARTY FOR CONSEQUENTIAL, INCIDENTAL, SPECIAL OR EXEMPLARY DAMAGES ARISING OUT OF OR RELATED TO THE SHREDDER OR THE SCOPE OF WORK, WHETHER IN ACTION BASED ON CONTRACT, TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY) OR ANY OTHER LEGAL THEORY, INCLUDING, BUT NOT LIMITED TO, LOSS OF ANTICIPATED PROFITS, OR BENEFITS OF USE OR LOSS OF BUSINESS, EVEN IF OMNISOURCE IS APPRISED OF THE LIKELIHOOD OF SUCH DAMAGES OCCURRING.

IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT EACH AND EVERY PROVISION OF THIS AGREEMENT WHICH PROVIDES FOR A LIMITATION OF LIABILITY, DISCLAIMER OF WARRANTIES OR EXCLUSION OF DAMAGES, IS INTENDED BY THE PARTIES TO BE SEVERABLE FROM ANY OTHER PROVISION AND IS A SEPARABLE AND INDEPENDENT ELEMENT OF RISK ALLOCATION AND IS INTENDED TO BE ENFORCED AS SUCH.

3101576.2                                          3

Exhibit E

9.    **DEFAULT.** An Event of Default shall occur hereunder if:

   (a)    Contractor fails to commence or complete the Scope of Work on the schedule required by paragraph 2 of this Agreement; or

   (b)    Contractor transports the Shredder or any part thereof to any location other than a location determined by OmniSource; or

   (c)    Contractor fails to maintain the insurance as required by this Agreement; or

   (d)    Contractor fails to perform or observe any other covenant, condition or agreement to be performed or observed by it hereunder, and such failure or breach shall continue unremedied for a period of three (3) days after Contractor becomes aware of such failure or breach; or

   (e)    Contractor shall (i) be adjudicated insolvent or a bankrupt, or cease, be unable, or admit in writing its inability to pay its debts as they mature, or make a general assignment for the benefit of, or enter into any composition or arrangement with creditors; (ii) apply for or consent to the appointment of a receiver, trustee or liquidator of it or of a substantial part of its property, or authorize such application or consent, or proceedings seeking such appointment shall be instituted against it without such authorization, consent or application and shall continue undismissed for a period of forty-five (45) days; (iii) authorize or file a voluntary petition in bankruptcy or apply for or consent to the application of any bankruptcy, reorganization in bankruptcy, arrangement, readjustment of debt, insolvency, dissolution, moratorium or other similar law of any jurisdiction, or authorize such application or consent; or proceedings to such end shall be instituted against it without such authorization, application or consent and such proceeding instituted against it shall continue undismissed for a period of forty-five (45) days.

10.    **REMEDIES.** Upon the occurrence of any Event of Default and at any time thereafter, OmniSource may, with or without cancelling this Agreement, in its sole discretion, do any one or more of the following:

   (a)    Upon written notice to Contractor cancel this Agreement;

   (b)    Upon written notice to Contractor, remove Contractor from the Real Estate and any other OmniSource location and repossess the Shredder or any part thereof wherever found, with or without legal process and without liability for suit, action or other proceeding by Contractor (any damages occasioned by such repossession being hereby expressly waived by Contractor);

   (c)    Satisfy any damages sustained by OmniSource arising from Contractor's Event of Default by payment from the Earnest Money deposited by Buyer and held by the Title Company pursuant to the Real Estate Purchase Agreement, upon demand made by

3101576.2

4

OmniSource to the Title Company (as the terms "Earnest Money" and "Title Company" are defined in the Real Estate Purchase Agreement).

(d)    Exercise any other right or remedy which may be available to it under applicable law; and

(e)    A cancellation hereunder shall occur only upon notice by OmniSource and only as to such parts of the Shredder as OmniSource specifically elects to cancel and this Agreement shall continue in full force and effect as to the remaining items, if any.

No remedy referred to in this paragraph is intended to be exclusive but shall be cumulative and in addition to any other remedy referred to above or otherwise available to OmniSource at law or in equity. No express or implied waiver by OmniSource of any default shall constitute a waiver of any other default by Contractor or a waiver of any of OmniSource's rights.

**11.**   **BINDING EFFECT.** This Agreement shall inure to the benefit of, and be enforceable against, the parties and their respective successors and assigns. OmniSource and Contractor intend this Agreement to be a valid and binding legal instrument and agree that no provision of this Agreement which may be deemed unenforceable shall in any way invalidate any other provision or provisions of this Agreement, all of which shall remain in full force and effect.

**12.**   **WAIVER OF JURY TRIAL.** THE PARTIES HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. EITHER PARTY MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT AMONG THE PARTIES IRREVOCABLY TO WAIVE TRIAL BY JURY, AND ANY PROCEEDING WHATSOEVER BETWEEN THEM RELATING TO THIS AGREEMENT SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

**13.**   **GOVERNING LAW: JURISDICTION; VENUE; SERVICE OF PROCESS.** THIS AGREEMENT SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF INDIANA, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE. CONTRACTOR HEREBY CONSENTS TO THE JURISDICTION AND VENUE OF THE COURTS OF ALLEN COUNTY, STATE OF INDIANA WITH RESPECT TO ANY ACTION COMMENCED HEREUNDER AND AGREES THAT ANY ACTION INITIATED BY CONTRACTOR MUST BE BROUGHT IN SAID COURT. NOTHING CONTAINED HEREIN, HOWEVER, IS INTENDED TO PRECLUDE OMNISOURCE FROM COMMENCING ANY ACTION HEREUNDER IN ANY COURT HAVING JURISDICTION THEREOF. CONTRACTOR AGREES THAT SERVICE OF PROCESS IN ANY ACTION SHALL BE SUFFICIENT IF MADE BY FIRST-CLASS CERTIFIED MAIL, RETURN-RECEIPT REQUESTED TO THE ADDRESS OF CONTRACTOR SET FORTH IN THIS AGREEMENT.

*[Signature page follows]*

Exhibit E

IN WITNESS WHEREOF, the parties hereto have executed this Shredder Moving Agreement on the day, month and year set forth below.

**OMNISOURCE, LLC**

By: _____

    G. Scott Gibble, Executive Vice President

**BURGESS CORPORATION**

By: _____

Vincent O. Burgess    President
          (Printed Name and Title)

Address:
1551 Point Harbor Road
Wilmington, N.C. 28401
_____

3101576.2

6

Exhibit E

<u>**Exhibit A**</u>

**Scope of Work**

(see attached)

3101576.2

7

Exhibit E



# CORPORATION

Wilmington Shredder Disassemble and Transportation to Storage

## 2830 US Highway 421 N

## Wilmington, NC 28401

## Scope of Work

Contractor to disassemble and transport all of the following equipment and components:

- Infeed conveyor & assembly drive chain and support structure
- Feed chute, Dual Feed Rollers (DFR) and support structure
- Shredder (aka Mill) Rotor installed in base section
- Shredder bonnet, mid-section, and base section
- Shredder liner package can be dropped out of mid and base section for weight reduction
- Spare Shredder Rotor
- Shredder base support structure and spring boxes
- Under Mill Oscillating (UMO) Conveyor
- Downstream conveyors, Magnet stand(s), cyclone, "z" box and picking house
- Shredder motor and drive shaft
- Motor Control Center in Shredder Motor Building
- Miscellaneous Control Panels in Shredder Motor Building
- Hydraulic units in Shredder Motor Building
- Rectifiers in Shredder Motor Building
- Motor starter in Shredder Motor Building
- Spare parts and castings stored on site
- All ancillary equipment identified by OmniSource pertaining to the shredder

The items above comprise the Shredder and its ancillary equipment.

Exhibit E

Contractor to transport all items to OmniSource location(s) within 300 miles of this site, with location(s) to be determined by OmniSource at time of disassembly.

Contractor to provide all disassembly, rigging, loading and transportation under OmniSource supervision. OmniSource will be responsible for off-loading at the designated OmniSource location(s). Off-loading is to be coordinated between Contractor and OmniSource.

OmniSource will turn off in the substation the electricity to the shredder building. Contractor to then cut and abandon all conduits and wires supplying power to the shredder motor and any ancillary equipment.

Contractor to drain hydraulic systems and properly dispose of drained fluids. Contractor to cut and abandon all remaining piping.

The following items are not included in this Scope of Work and are to remain on site:

- All Buildings
- Structures
- Substation and pad mount transformers
- Concrete bin walls
- Fire pump house
- Water storage tank
- Truck Scale
- Colonial Materials building and related structures (existing tenant)

Contractor must comply with all OmniSource safety requirements.

Exhibit E

## FIRST AMENDMENT TO SHREDDER MOVING AGREEMENT

THIS FIRST AMENDMENT TO SHREDDER MOVING AGREEMENT ("Amendment") is entered into as of the _15th_ day of June, 2022, by and between **OmniSource, LLC**, an Indiana limited liability company ("OmniSource") and **Burgess Corporation**, a North Carolina corporation ("Contractor"), under the following circumstances:

A.  OmniSource and Contractor entered into a Shredder Moving Agreement dated November 22, 2021 (the "Agreement").

B.  The parties desire to amend the Agreement as set forth herein.

NOW THEREFORE, in consideration of the foregoing and the mutual promises contained herein, the parties hereto agree as follows.

1.     **SCHEDULE**.  With respect to paragraph 2 of the Agreement, the parties acknowledge that the Scope of Work has not been completed. OmniSource and Buyer are nevertheless proceeding with the closing on the sale of the Real Estate pursuant to the Real Estate Purchase Agreement, as amended, and notwithstanding the closing, Contractor shall continue with commercially reasonable diligence to complete the Scope of Work as soon as commercially possible after the closing. To assist Contractor, OmniSource agrees that with respect to the transportation of certain oversized parts of the Shredder, OmniSource shall arrange for rail transportation from the Real Estate to the designated destinations, at Contractor's expense. Within fifteen (15) days after the date of this Amendment, and, if requested by Contractor, within fifteen (15) days after Contractor's request for more rail cars, OmniSource shall order the rail cars needed to transport the oversized parts of the Shredder. Within fifteen (15) days after the placement of rail cars on the Real Estate, Contractor shall have so many of the parts of the Shredder as will safely and reasonably fit properly loaded on the rail cars and ready for shipment. Contractor shall also continue to load and transport all other parts of the Shredder by truck as soon as commercially possible.

2.     **REMEDIES**.  The remedy available to OmniSource set forth in paragraph 10(c) of the Agreement is hereby deleted and replaced with the following:

(a)     Satisfy any damages sustained by OmniSource arising from Contractor's Event of Default by payment from the Shredder Escrow deposited by Buyer and held by the Title Company pursuant to the related escrow agreement entered into pursuant to the Real Estate Purchase Agreement, as amended, upon demand made by OmniSource to the Title Company (as the terms "Shredder Escrow" and "Title Company" are defined in the Real Estate Purchase Agreement, as amended).

3.     **DEFINITIONS**.  Capitalized terms not otherwise defined herein shall have the meaning given to them in the Agreement.

4.     **COUNTERPARTS; EXECUTION**.  This Amendment may be executed in one or more counterparts, all of which shall be considered one and the same amendment, and shall become

3337559.4

Exhibit F

effective when one or more counterparts have been signed by each of the parties and delivered to the other party. The exchange of copies of this Amendment and of signature pages by facsimile or electronic transmission shall constitute effective execution and delivery of this Amendment as to the parties and may be used for all purposes. Signatures of the parties transmitted by facsimile or electronically shall be deemed their original signatures for all purposes.

5. The Agreement, as amended herein, remains in full force and effect.

*[Signature page follows]*

2

Exhibit F

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment to Shredder Moving Agreement on the day, month and year set forth below.

**OMNISOURCE, LLC**

By: _____
G/Scott Gibble, Executive Vice President

**BURGESS CORPORATION**

By: _____
Vincent O. Burgess, President

Acknowledged and agreed to with respect to paragraph 2 of the foregoing Amendment.

**BURGESS GROUP CONSOLIDATED, LLC**

By: _____
Vincent O. Burgess, Member/Manager

3337559.4

3

Exhibit F

## ESCROW AGREEMENT FOR SHREDDER MOVING

THIS ESCROW AGREEMENT FOR SHREDDER MOVING (this "Agreement") is made and entered into June __16_, 2022, by and between OMNISOURCE, LLC, an Indiana limited liability company ("OmniSource"), BURGESS GROUP CONSOLIDATED, LLC, a North Carolina limited liability company ("Burgess") and CHICAGO TITLE INSURANCE COMPANY ("Escrow Agent"), under the following circumstances:

A.    Contemporaneous with this Agreement, OmniSource and Burgess are closing on the real estate state sale and purchase transaction pursuant a Real Estate Sale and Purchase Agreement dated November 22, 2021, as amended by a First Amendment to Real Estate Sale and Purchase Agreement dated January 18, 2022 and a Second Amendment to Real Estate Sale and Purchase Agreement dated June 15, 2022 (collectively, the "Purchase Agreement").

B.    In connection with the Purchase Agreement, OmniSource and Burgess's affiliate, Burgess Corporation ("Burgess Affiliate") entered into a Shredder Moving Agreement dated November 22, 2022, as amended by a First Amendment to Shredder Moving Agreement dated June 15, 2022 (collectively, the "Shredder Agreement") wherein Burgess's Affiliate has agreed to disassemble and transport OmniSource's metal shredder and ancillary shredder equipment (collectively, the "Shredder") from the Real Estate at Burgess Affiliate's sole cost and expense prior to closing on the sale and purchase of the Real Estate and as a condition of Burgess's and OmniSource's obligations to close on the purchase and sale of the Real Estate.

C.    In consideration for Burgess depositing the amount of Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00) into an escrow to be held by the Escrow Agent pursuant to this Agreement as security for the performance of Burgess Affiliate under the Shredder Agreement, Burgess and OmniSource have agreed to waive their respective conditions set forth in the Purchase Agreement with respect to the Shredder having been moved prior to Closing.

NOW, THEREFORE, in mutual consideration of the promises contained herein, and for other good and valuable consideration, the parties agree as follows:

1.    At the Closing, Burgess shall deliver to and deposit with Escrow Agent, the sum of Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00) (the "Escrowed Funds"). The Escrowed Funds are being deposited with Escrow Agent for the purpose of providing security to OmniSource for the performance of, and in the event default by, Burgess Affiliate under the terms and provisions of the Shredder Agreement. The Escrowed Funds shall be held by Escrow Agent consistent with the "Conditions of Escrow" attached hereto as Exhibit A and disposed of solely for the purposes described herein and in accordance with the terms and conditions of this Agreement.

Exhibit G

2.    Burgess shall cause Burgess Affiliate to continue, now and after Closing on the sale and purchase of the Real Estate to actively disassemble the Shredder on the Real Estate and to remove the Shredder completely from the Real Estate and transport the same to locations determined by OmniSource as soon as commercially possible as required by the Shredder Agreement; if Burgess Affiliate shall fail to do so, Burgess Affiliate shall be deemed to be in default under the Shredder Agreement, and OmniSource may exercise any one or more of its remedies available under the Shredder Agreement, including to satisfy any damages sustained by OmniSource arising from Burgess Affiliate's default under the Shredder Agreement from the Escrowed Funds upon demand made by OmniSource to Escrow Agent, as provided herein.

3.    Burgess does hereby grant and convey to Burgess Affiliate an ongoing license and right of entry over, across, under and in the Real Estate for the purpose of completing the Scope of Work (as defined in the Shredder Agreement) in accordance with the terms and conditions set forth herein ("Right of Entry"), which Right of Entry shall also be granted to OmniSource to the extent necessary to arrange for rail transportation as provided in the Shredder Agreement. Burgess agrees to cooperate with Burgess Affiliate and OmniSource to the extent commercially reasonable to allow Burgess Affiliate to complete the Scope of Work as soon as possible after the date of this Agreement.   The Right of Entry shall terminate upon the termination of this Agreement.

4.    Escrow Agent shall hold the Escrowed Funds in an account in the name of Burgess and OmniSource (the "Escrow Account") until authorized hereunder to deliver the Escrowed Funds as follows:

a.    Within three (3) business days following receipt of a written certified demand from OmniSource, copied to Burgess, describing the default of Burgess Affiliate under the Shredder Agreement and the amount of damages sustained by OmniSource arising from the default, Escrow Agent shall disburse to OmniSource from the Escrowed Funds the amount set forth in such demand.

b.    Within three (3) business days following receipt of a written instruction executed by both Burgess and OmniSource, Escrow Agent shall disburse to the party indicated in the instruction from the Escrowed Funds the amount of the distribution set forth in such written instruction.

c.    Upon completion of the Scope of Work set forth in the Shredder Agreement and receipt by OmniSource of full reimbursement from Burgess Affiliate for charges billed to OmniSource by the rail carrier for the rail transportation arranged by OmniSource ("Rail Transportation Costs"), Burgess and OmniSource shall within five (5) days thereafter execute and submit a joint written instruction to Escrow Agent to release to Burgess the balance of the Escrow Account, together with all interest thereon and less any fees of Escrow Agent in handling the Escrow Account.

d.    Within three (3) business days following receipt of the written instruction for the distribution of the balance of the Escrowed Funds by both Burgess and OmniSource, Escrow Agent shall disburse to Burgess the balance of the Escrowed

Exhibit G

Funds, together with all interest thereon, less any fees of Escrow Agent in handling the Escrow Account.

e.    Upon receipt of a final and non-appealable order of a court of competent jurisdiction with respect to payment of all or any portion of the Escrowed Funds, Escrow Agent shall deliver the amount of the Escrowed Funds specified in such order.

f.    Escrow Agent shall not make or permit any disbursements from the Escrow Account except as expressly provided and permitted in this Agreement. To the extent of any conflict between this paragraph 4 and Exhibit A of this Agreement, this paragraph 4 shall control.

5.    This Agreement expressly sets forth all the duties of Escrow Agent with respect to the holding and disposition of the Escrowed Funds. Escrow Agent shall not be bound by the provisions of any agreement among OmniSource and Burgess except this Agreement. Escrow Agent shall not be liable except for its own negligence or willful misconduct, and except with respect to claims for which Escrow Agent shall have been finally adjudicated as responsible due to its negligence or willful misconduct, OmniSource and Burgess shall jointly and severally indemnify and hold Escrow Agent harmless from and against any and all losses, liabilities, claims, actions, damages and expenses (including the fees and expenses of its legal counsel), arising out of and in connection with this Agreement. Escrow Agent does not have any interest in the Escrowed Funds deposited hereunder but is serving as escrow agent only and having only possession thereof. In the event of any disagreement between the parties resulting in adverse claims or demands being made in connection with the Escrowed Funds, or in the event that Escrow Agent in good faith is in doubt as to what action it should take hereunder, Escrow Agent shall request joint written instructions with respect to the Escrowed Funds and, in the absence of such instructions, shall be entitled to retain the Escrowed Funds until Escrow Agent shall have received a final non-appealable order of a court of competent jurisdiction directing delivery of the Escrowed Funds, in which event Escrow Agent shall disburse the Escrowed Funds in accordance with such order.

6.    Any notice, demand or request which may be permitted, required or desired to be given under this Agreement shall be given in writing and directed to OmniSource, Burgess and Escrow Agent as follows:

OmniSource:        OmniSource, LLC
                   7575 W. Jefferson Blvd.
                   Fort Wayne, IN 46804
                   Attn: G. Scott Gibble, Executive Vice President

With a copy to:    Barrett McNagny, LLP
                   215 E. Berry Street
                   Fort Wayne, IN 46802
                   Attn: David R. Steiner, Esq.

3339829.2                        - 3 -

Exhibit G

|              |                                                       |
|--------------|-------------------------------------------------------|
| Burgess:     | Burgess Group Consolidated                            |
|              | 605 Warsaw Road                                       |
|              | Clinton, NC 28328                                     |
|              | Attn: Vince Burgess, Member/Manager                   |
|              |                                                       |
| Escrow Agent:| Chicago Title Insurance Company                       |
|              | 200 South Tryon Street, Suite 800                     |
|              | Charlotte, NC 28202                                   |
|              | Attn: Dana Van Nus, Sr. Commercial Underwriter        |

All notices shall be delivered by hand, by United States mail, or by a nationally recognized overnight courier service. Notices shall be deemed properly delivered and received (i) on the date delivered, if delivered personally; (ii) on the earlier to occur of (A) actual receipt or rejection, as the case may be, or (B) two (2) business days after depositing in the U.S. Mail; and (iii) with respect to a nationally recognized overnight courier service, one (1) business day after deliver to the nationally recognized overnight courier service.

7.    This Agreement shall terminate upon the release or disposition of the Escrowed Funds pursuant to paragraph 4(a) – (e) or following receipt of a joint written instruction executed by both OmniSource and Burgess that this Agreement has or will terminate as of the date set forth in the instruction.

8.    Capitalized terms not otherwise defined herein shall have the meaning given to them in the Purchase Agreement.

9.    This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party. The exchange of copies of this Agreement and of signature pages by facsimile or electronic transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used for all purposes. Signatures of the parties transmitted by facsimile or electronically shall be deemed their original signatures for all purposes.

[SIGNATURE PAGE FOLLOWS]

Exhibit G

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day, month and year set forth below.

"BURGESS"

BURGESS GROUP CONSOLIDATED, LLC,
a North Carolina limited liability company

By: _____
　　　Vincent O. Burgess, Member/Manager

"OMNISOURCE"

OMNISOURCE, LLC, an Indiana limited liability company

By: _____
　　　G. Scott Gibble, Executive Vice President

CHICAGO TITLE INSURANCE COMPANY

By: _____
　　　Name:　M. Scott Mansfield
　　　Its:　　V.P.

3339829.2

- 5 -

Exhibit G

## Exhibit A

### Conditions of Escrow

(see attached)

Exhibit G

**CHICAGO TITLE COMPANY, LLC and/or CHICAGO TITLE INSURANCE COMPANY**
**CONDITIONS OF ESCROW**

CHICAGO TITLE COMPANY, LLC and/or CHICAGO TITLE INSURANCE COMPANY (hereinafter "Chicago Title") accepts the funds to be held by Chicago Title (hereinafter "Funds") as described in the letter and/or agreement between the parties and/or any related escrow agreement(s) (hereinafter "Agreement") subject to these Conditions of Escrow:

1.  The Funds may be processed for collection in the normal course of business by Chicago Title, who may commingle funds received by it with escrow funds of others in the regular escrow account at Wells Fargo Bank, or such other institution as maintained from time to time by Chicago Title (hereinafter the "Depository"). The parties to this escrow acknowledge that the maintenance of such escrow accounts with some Depository institutions may result in Chicago Title being provided with an array of bank services, accommodations or other benefits by the Depository institution. Chicago Title or its affiliates also may elect to enter into other business transactions with or obtain loans for investment or other purposes from the Depository institution. All such services, accommodations and other benefits shall accrue to Chicago Title, and Chicago Title shall have no obligation to account to the parties to the escrow for the value of such services, accommodations or other benefits.

2.  Chicago Title shall not be liable for any loss caused by the failure, suspension, inability to pay funds or accrued interest, bankruptcy or dissolution of the Depository. Parties to the Agreement acknowledge their familiarity with limitations on payments made on accounts in excess of $250,000.00 and the cumulative effect of other accounts held or owned by the parties in the Depository.

3.  Chicago Title is not responsible for levies by taxing authorities or judicial order based upon the taxpayer identification number used to establish an interest-bearing account.

4.  Chicago Title shall not be liable for loss or damage resulting from:

    a.  Any good faith act or forbearance of Chicago Title;
    b.  Any default, error, action or omission of any party, other than Chicago Title;
    c.  Any defect in the title to any property. If elected by the parties, any title defect should be addressed under a separate policy of title insurance issued as a part of the transaction contemplated herein;
    d.  The expiration of any time limit or other delay which is not solely caused by the failure of Chicago Title to proceed in its ordinary course of business, and in no event where such time limit is not disclosed in writing to the Chicago Title;
    e.  The lack of authenticity of the signatory to sign such writing;
    f.  Chicago Title's compliance with all attachments, writs, orders, judgments, or other legal process issued out of any court;
    g.  Chicago Title's assertion or failure to assert any cause of action or defense in any judicial or administrative proceeding;
    h.  Any loss or damage which arises after the Funds have been disbursed in accordance with the terms of this Agreement; or
    i.  Any delay of this escrow due to fires, acts of God, acts of governmental authorities, strikes, pandemics, or other cause beyond the control of Chicago Title.

5.  Chicago Title shall hold the Funds until written release/disbursement instructions are received from the parties to the Agreement regardless of any conflicting provisions in the Agreement or any other agreements between the parties, whether Chicago Title has signed the Agreement or not. Chicago Title reserves the unqualified right to interplead the Funds into any court action related to the Funds. Chicago Title shall be fully indemnified by the parties hereto for all expenses, costs, and reasonable attorneys' fees incurred in connection with any interpleader action which Chicago Title may file, in its sole discretion, to resolve any dispute as to the Funds or which may be filed against Chicago Title. Such costs, expenses or attorneys' fees may be deducted from the Funds. For purposes of these Conditions of Escrow, the term "interplead" or "interpleader" shall include the deposit of disputed monies with the clerk of court under NCGS 93A-12.

6.  If Chicago Title is made a party to any judicial, non-judicial or administrative action, hearing or process based on acts of any of the other parties hereto and not on the malfeasance and/or negligence of Chicago Title in performing its duties hereunder, the expenses, costs and reasonable attorneys' fees incurred by Chicago Title in responding to

Revised March 3, 2022

Exhibit G

such action, hearing or process may be deducted from the Funds held hereunder and the party/parties whose alleged acts are a basis for such proceedings shall indemnify, save and hold Chicago Title harmless from said expenses, costs and fees so incurred.

7. If a party to the Agreement requests that all or a portion of the Funds be invested in an interest-bearing account (hereinafter "Invested Funds") and if Chicago Title agrees to do so, Chicago Title is hereby authorized and directed to invest the Invested Funds in the name of the party by Chicago Title Company, LLC, as escrow agent, as follows:

   a. Chicago Title shall have NO OBLIGATION TO INVEST any of the Funds unless and until Chicago Title receives satisfactory investment instructions and IRS Form W-9 Request for Taxpayer Identification Number and Certification from the party to whom interest is to accrue.

   b. Invested Funds will be invested in an FDIC Money Market Account at the discretion of Chicago Title unless otherwise agreed in writing by Chicago Title and the parties to this Agreement. The investment shall be subject to the rules, regulations, policies and procedures of the Depository.

   c. Interest shall be payable at the time the Funds are disbursed in accordance with the terms of the Agreement and written release/disbursement instructions from the parties to the Agreement.

   d. All investments will be made in the regular course of business. To be entitled to same-day investment (assuming collected funds are received), the Funds to be invested must be received by noon; otherwise such Funds will be invested on the next business day.

8. In the event of any conflict between these Conditions of Escrow and the Agreement or any other agreements between the parties hereto regarding the Funds, the provisions of these Conditions of Escrow shall prevail.

Revised March 3, 2022

Exhibit G